# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 7, 2010         Decided June 3, 2011

No. 10-5014

WILFRED SAMUEL RATTIGAN,
APPELLEE

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL, UNITED STATES
DEPARTMENT OF JUSTICE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-02009)

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs was *Ronald C. Machen Jr.*, U.S. Attorney, and *Marleigh D. Dover*, Assistant Director. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Jonathan C. Moore* argued the cause for appellee. With him on the brief was *James R. Klimaski*,

Before: ROGERS, TATEL, and KAVANAUGH, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

TATEL, *Circuit Judge*:  In this case, a jury found that the FBI violated Title VII of the Civil Rights Act of 1964 by launching a security investigation of plaintiff, then an agent in its Saudi Arabia office, in retaliation for his filing of a discrimination complaint. On appeal, the government argues that plaintiff's claim is nonjusticiable under Supreme Court and D.C. Circuit case law because adjudicating Title VII liability called for the jury to second-guess security judgments committed by law to FBI discretion. Because we agree that plaintiff's case, as presented to the jury, invited just such second-guessing, we vacate the judgment in plaintiff's favor. But because we also believe that plaintiff might be able to pursue his retaliation claim without calling into question unreviewable security decisions, we remand for further proceedings consistent with this opinion.

**I.**

Plaintiff-Appellee Wilfred Rattigan is a black male of Jamaican descent who has converted to Islam. He has worked for the FBI since 1987. In 1999, the FBI transferred Rattigan to the Office of the Legal Attaché at the United States Embassy in Riyadh, Saudi Arabia. The FBI has Legal Attaché offices, also known as "LEGAT" offices, in over forty countries. *See Rattigan v. Holder* ("*Rattigan I*"), 604 F. Supp. 2d 33, 37 (D.D.C. 2009). Agents in these offices function as liaisons to security services in their host countries. LEGAT offices are usually run by two agents, referred to respectively as the Legal Attaché ("LEGAT") and the Assistant Legal Attaché ("ALAT"), as well as by temporary duty staff. *Id.* LEGAT offices report to the FBI's Office of International Operations (OIO), located in Washington, D.C. *Id.* at 38.

Having initially served as ALAT in the Riyadh office, Rattigan was promoted to LEGAT in July 2000.

During his tenure in the Riyadh office, Rattigan made several complaints of workplace discrimination. Of particular relevance to this case, he filed a report with the Equal Employment Opportunity (EEO) Office on October 26, 2001, alleging racial and national origin discrimination. This report followed a confrontation between Rattigan and his immediate supervisor, OIO Unit Chief Cary Gleicher, while Gleicher was visiting the Riyadh office in mid-October 2001. In a one-on-one meeting and then later in an office-wide meeting, Rattigan accused Gleicher and two other OIO supervisors—Section Chief Michael Pyszczymuka and Deputy Assistant Director Leslie Kaciban—of rejecting his office's requests for additional assistance and weapons on account of his race. Rattigan also claimed that the FBI sent Gleicher to visit the Riyadh office only because of Rattigan's race. Returning to Washington, Gleicher informed Pyszczymuka and Kaciban of Rattigan's complaints. On November 9, 2001, an EEO counselor interviewed Rattigan about his complaint, which included the allegations he had previously raised with Gleicher, as well as other issues, such as Rattigan's contention that Kaciban had made racially tinged threats. At a conference in January 2002, Rattigan personally informed Gleicher and Pyszczymuka that he was pursuing discrimination claims against them. An EEO counselor met with Kaciban, Gleicher, and Pyszczymuka about Rattigan's complaint on January 10, 2002.

At around the same time, the events giving rise to the FBI's security investigation of Rattigan began unfolding. In late November 2001, Gleicher sent OIO Special Agent Donovan Leighton on a twenty-one day assignment to the Riyadh office, during which Leighton supposedly became

concerned about Rattigan's behavior and management of the office. For example, on several occasions Leighton saw Rattigan wearing "full Saudi Arabian costume" while in the U.S. embassy. Considering this "very unusual," Leighton and other staff wondered whether Rattigan might be "inappropriately under the influence of his Saudi counterparts." Trial Tr. at 57–60 (July 23, 2009). Leighton also claimed he heard Rattigan talk about hosting "a fairly wild party" attended by several women described as "nurses." *Id.* at 62. According to Leighton, temporary duty personnel recounted other similarly raucous events hosted by Rattigan.

Following a short vacation, Leighton returned to OIO's Washington Office in January 2002, becoming interim desk officer for LEGAT Offices in Pakistan and the Middle East, including the Riyadh office. Leighton testified that his interactions with Rattigan during this time led him to become more concerned, especially given the importance of Rattigan's office to the FBI's mission in light of the September 11, 2001 terrorist attacks. After consulting his OIO supervisors, Leighton documented his concerns in an electronic communication, i.e., a memorandum written for internal use by FBI agents and other employees.

In his electronic communication, which he began drafting in the end of January and completed in March, Leighton reported, among other things, (1) that Rattigan occasionally wore Saudi national clothing he had received as a gift from the Saudi security service, creating the impression he had "gone native," (2) that Rattigan's Saudi colleagues were attempting to find him a "suitable wife," (3) that Rattigan hosted wild parties attended by other agents and by female "nurses," a term that might have "be[en] used by . . . Rattigan as a euphemism for 'prostitutes,'" (4) that Rattigan and his assistant, Abdel-Hafiz, were inattentive to the FBI's

investigation of the September 11 attacks, (5) that Rattigan took an extended absence to make a pilgrimage to Mecca along with Abdel-Hafiz and their Saudi counterparts during which he could be contacted only through the Saudi security service, and (6) that Rattigan refused to allow temporary duty staff to interact directly with the Saudi security service. Leighton gave a draft of the electronic communication to Pyszczymuka who then returned it (along with suggestions made by his assistant) and directed Leighton to address the final communication to the attention of the Security Division's Section Chief, Edward Shubert. When Pyszczymuka received the revised electronic communication from Leighton, he forwarded it along to the Security Division together with a cover memo acknowledging Rattigan's pending discrimination complaint against OIO supervisors including himself and asking the Division to "peruse the [communication] and consider any potential security issues, making the appropriate referrals."

In response to this referral, Shubert reviewed Leighton's electronic communication and decided to initiate a security investigation. The investigation was conducted by the Division's Analytical Integration Unit, which, due to staffing constraints, obtained two additional investigators from the FBI's Inspection Division. *See Rattigan I*, 604 F. Supp. 2d at 44. One of those investigators, Cheryl Tucker, interviewed sixteen FBI employees previously assigned to the Riyadh office, including Leighton, and filed a report concluding that "the potential risks to FBI security and information, as documented by . . . Leighton, are unfounded." More specifically, Tucker found that the information obtained from her interviews "failed to support . . . Leighton's assertions that the women described as 'nurses' were prostitutes." Instead, she concluded, the women were actual nurses who attended parties at diplomatic residences. Tucker also found no support

for Leighton's suspicion that Rattigan's relationship with Saudi intelligence officials revealed foreign influence. After conducting its own review of the evidence, the Analytical Integration Unit reached the same conclusion, issuing a final report finding "no security risk present relative to the issues of allegiance, foreign influence, or personal conduct on the part of LEGAT Rattigan." The Unit's report also indicated that Leighton's assertions regarding Rattigan's supposed inactivity in the FBI's September 11 investigation "lack[ed] corroboration and [were] unfounded." Accordingly, the Security Division closed the investigation.

Rattigan filed suit in 2004, raising several claims of unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In a series of rulings, the district court dismissed or granted summary judgment to the government as to all claims save one: Rattigan's contention that the FBI retaliated against him "for complaining that OIO officials had discriminated against him on the basis of his race and national origin" by subjecting him to a security clearance investigation. *See Rattigan v. Holder* ("*Rattigan II*"), 636 F. Supp. 2d 89, 90 (D.D.C. 2009) (summarizing this procedural history). On the eve of trial, the government filed a motion to dismiss, arguing for the first time that Rattigan's retaliation claim was nonjusticiable because, according to the government, it would require the jury to second-guess national security judgments committed by law to FBI discretion. The district court denied the motion. *See id.* at 91, 95. Following trial, the jury returned a verdict for Rattigan, and the district court denied the government's post-trial motions.

The government now appeals, focusing primarily on its argument that Rattigan's Title VII claim is nonjusticiable. Our review is *de novo*. *See Kaufaman v. Mukasey*, 524 F.3d 1334,

1337 (D.C. Cir. 2008) (reviewing *de novo* the district court's dismissal of a complaint on the ground that it challenged a decision committed to the Attorney General's discretion).

## II.

As the Supreme Court explained in *Department of Navy v. Egan*, the President as Commander in Chief and head of the Executive Branch has constitutional authority "to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information." 484 U.S. 518, 527 (1988). By Executive Order, the President has delegated that authority to heads of executive agencies, including the FBI Director. *See* Exec. Order No. 12,968 § 1.2(b), 60 Fed. Reg. 40,245, 40,246 (Aug. 2, 1995). Based on eligibility standards prescribed in that order, agencies grant security clearances only where "facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of national security." *Id.* § 3.1(b), 60 Fed. Reg. at 40,250.

Given the Executive's primacy in national security and the discretionary nature of security clearance decisions, courts have, absent congressional instruction to the contrary, carefully avoided intruding into Executive judgments concerning who should receive clearance. In *Egan*, the Supreme Court held that the Merit Systems Protection Board lacked statutory authority to review an agency's decision to deny a newly-hired employee a security clearance even though the employee then lost his job. 484 U.S. at 520. Acknowledging the general presumption favoring review of agency decisions, the Court nonetheless stated that this proposition "runs aground when it encounters concerns of

national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." 484 U.S. at 527. Emphasizing that "no one has a 'right' to a security clearance" and that denial of clearance is meant only to assess whether an individual might someday compromise sensitive information rather than to "pass[] judgment upon an individual's character," the Court explained that the decision to grant or deny security clearance was essentially an act of "[p]redictive judgment" that "must be made by those with the necessary expertise in protecting classified information." *Id.* at 528–29. By contrast, "it is not reasonably possible for an outside nonexpert body to review the substance" of the agency's predictive judgment to determine "whether the agency should have been able to make the necessary affirmative prediction with confidence" or "what constitutes an acceptable margin of error in assessing the potential risk." *Id.* at 529.

Following *Egan*, courts of appeals have consistently held that federal courts, like the administrative board at issue in that case, have no authority to review the merits of agency decisions to withhold, revoke, or suspend security clearances absent contrary direction from Congress. *See El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 182 (3d Cir. 2010) (citing cases and recognizing the consensus of the circuits regarding the scope of *Egan*). In *Ryan v. Reno*, we joined several circuits in holding that *Egan* applies to Title VII claims and bars judicial resolution of "a discrimination claim based on an adverse employment action resulting from an agency security clearance decision." 168 F.3d 520, 523 (D.C. Cir. 1999). We explained that adjudicating plaintiff's Title VII claim would require the court to evaluate the merits of the agency's security clearance decision. *Ryan*'s application of

*Egan* follows inexorably from the manner in which the factfinder resolves Title VII discrimination and retaliation claims. Absent evidence of mixed motives, such claims proceed according to the familiar three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which (1) the plaintiff must first prove a prima facie case of discrimination, (2) if the plaintiff does so, then the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the action in question," and (3) if the defendant meets that burden, the plaintiff must show that the defendant's proffered reasons "were not its true reasons, but were a pretext for discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (internal quotation marks omitted); *see also Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (applying the same framework to retaliation claims). As we recognized in *Ryan*, the problem for plaintiffs who allege the discriminatory or retaliatory denial or revocation of a security clearance under the *McDonnell Douglas* framework is that "a court cannot clear the second step of *McDonnell Douglas* without running smack up against *Egan*." 168 F.3d at 524. Why? Because to determine whether the employer's proffered nondiscriminatory reason for the adverse employment action—i.e., that the plaintiff's clearance was denied or revoked on national security grounds—was in fact pretext for discrimination would require the factfinder to evaluate the validity of the government's security concerns. Quoting the Ninth Circuit, we explained:

> The more valid a reason appears upon evaluation, the less likely a court will be to find that reason pretextual; the converse is also true. Even when the court faces independent evidence of a discriminatory motive, it is still necessary to weigh the validity of the defendant's proffered reasons when deciding if

they are pretextual. In short, the merit of such decisions simply cannot be wholly divorced from a determination of whether they are legitimate or pretextual.

*Id.* (quoting *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 197 (9th Cir. 1995)).

We reiterated *Ryan*'s holding in *Bennett v. Chertoff*, in which the plaintiff alleged that the Transportation Security Administration's termination of her employment after she failed to receive the requisite security clearance was discriminatory. 425 F.3d 999 (D.C. Cir. 2005). Finding the claim nonjusticiable and responding to plaintiff's contention that the Administration's security clearance explanation for her firing was pretextual, we recognized that "under *Ryan*, a court cannot adjudicate the credibility of that claim" because asking the trier of fact to assess the authenticity of the agency's reason would also require it "to evaluate the validity of the agency's security determination." *Id.* at 1003 (internal citation omitted).

In contrast to the claims raised in *Ryan*, *Bennett*, and *Egan* itself, Rattigan's claim implicates neither the denial nor revocation of his security clearance nor the loss of employment resulting from such action. After all, the FBI left Rattigan's clearance in place and he remains employed by that agency. Instead, Rattigan argues that his OIO supervisors referred him for a security investigation in order to retaliate against him because he filed Title VII claims and that this referral set in motion a several month long investigation by the FBI's Security Division that caused him serious emotional distress and damaged his reputation. For that reason, the precise issue presented by this case is one of first impression.

According to Rattigan, we have no need to reach this justiciability issue because the government forfeited that defense by failing to raise it in a timely fashion before the district court. Even though this litigation had stretched on for five years, the government did not move to dismiss under *Egan* until the day before trial. In its opinion denying that motion, the district court reprimanded the government for its delay but nonetheless considered the merits because it believed that the motion implicated subject matter jurisdiction. *See Rattigan II*, 636 F. Supp. 2d at 90 & n.1. Arguing that intervening precedent makes clear that the government's justiciability defense is non-jurisdictional, *see Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009), Rattigan contends that "[t]he government's apparent submission to judicial review for so many years, and the disrespect it showed the judicial process by failing to raise this argument earlier, warrants a finding of waiver[,]" Appellee's Br. 25. Although we appreciate the district court's annoyance with the government's failure to raise its justiciability argument earlier, we see no basis for forfeiture even assuming the argument could be forfeited—a question we have no reason to address. *See Oryszak*, 576 F.3d at 526–27 (Ginsburg, J., concurring) (contending that "a court must decline to adjudicate a nonjusticiable claim even if the defendant does not move to dismiss it under Fed. R. Civ. P. 12(b)(6)"). Not only did the government file its motion in accordance with Federal Rule of Civil Procedure 12(h)(2), which provides that the defense of failure to state a claim may be raised "at trial," but the district court thoroughly addressed the substance of the government's argument in a published opinion, *see Rattigan II*, 636 F. Supp. 2d 89. Accordingly, the government's justiciability argument is properly before us.

To resolve that issue, we must determine whether Rattigan's retaliation claim invited the jury to question the

sort of FBI security judgments that *Egan*, as applied to Title VII by *Ryan* and *Bennett*, makes unreviewable. We answer this question by breaking it down into two components. First, we ask exactly which security-clearance-related decisions *Egan* insulates from judicial review. Are all such decisions by *any* agency employee unreviewable, as the government and the dissent insist? Or, as Rattigan contends, does *Egan* command absolute deference only to security-clearance-related judgments of agency personnel specifically trained and authorized to make them? Neither the Supreme Court in *Egan* nor this court in *Bennett* or *Ryan* had to resolve this question given that plaintiffs in those cases challenged agency actions terminating or withholding employment after security clearances were actually denied or revoked. Second, after identifying the decisionmakers whose judgments the factfinder may not question, we assess whether the adjudication of Rattigan's claim subjected those judgments to jury scrutiny.

As to the first issue, the district court distinguished between employees working in OIO and those working in the Security Division because "the Security Division and not the OIO, is the FBI entity charged with assuring the loyalty, reliability, suitability, and trustworthiness of . . . employees . . . . who work with, will work with, or have access to sensitive or classified FBI information and material." *Id.* at 93 (internal quotations and alterations omitted). Nothing about Rattigan's claim, the district court explained, required the jury to review any judgments made by the Security Division. To the contrary, the Division determined that Rattigan's activities were "not inconsistent with the needs of national security," a judgment Rattigan "embraces." *Id.* As the district court saw it, Rattigan challenged only OIO's referral to the Security Division—"not the sort of judgment call that 'is committed by

law to the appropriate agency of the Executive Branch.' " *Id.* at 94 (quoting *Egan*, 484 U.S. at 527).

For its part, the government maintains that non-Security Division employees, including OIO officials, are a crucial "part of the apparatus by which security clearance determinations are made," and that they exercise expert "predictive judgment" when making referral decisions. Appellant's Br. 38–39; *see also* Dissenting Op. at 4. The government also points out that the OIO employees involved in this case, as Executive Branch officers with security clearances, are themselves "encouraged and expected" under the President's Executive Order to "report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security." Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253. If that decision to report is subjected to judicial scrutiny during Title VII litigation, the government asserts, then employees will "be seriously chilled in their fulfillment of this obligation." Appellant's Br. 36; *see also* Dissenting Op. at 4–5.

We agree with the district court that *Egan* shields from review only those security decisions made by the FBI's Security Division, not the actions of thousands of other FBI employees who, like Rattigan's OIO supervisors, may from time to time refer matters to the Division. The Supreme Court's answer to the question presented in *Egan* rested principally on the proposition that certain discretionary security decisions are, absent congressional direction, committed to the Executive's expert judgment. *See Egan*, 484 U.S. at 529–30. The Court emphasized that decisions about whether to grant or deny security clearance require "[p]redictive judgment . . . by those with the *necessary expertise* in protecting classified information." *Id.* at 529

(emphasis added). Under the Executive Order, such expert predictive judgments are made by "appropriately trained adjudicative personnel." § 3.1(b), 60 Fed. Reg. at 40,250. As the district court pointed out, at the FBI those "appropriately trained" personnel work in the Security Division. By contrast, OIO officials have neither the authority nor the training to make security clearance decisions. *See Rattigan II*, 636 F. Supp. 2d at 93.

To be sure, as the dissent points out, the Supreme Court in *Egan* did "consistently refer[] to 'the agency'—not to certain employees within an agency—as the decisionmaker that may not be second-guessed in security clearances cases." Dissenting Op. at 1–2. But we find nothing exceptional in the Court's choice of words given the "narrow question" before it: whether the Merit Systems Protection Board had authority to review the merits of an agency's *final* decision to deny or revoke an employee's security clearance. *Egan*, 484 U.S. at 520. The dissent never suggests that the *holding* of *Egan* dictates the result it advocates in this case of first impression, in which the designated agency experts reached a final security clearance determination that was favorable to the plaintiff but where he alleges that his agency supervisors referred him for investigation for an impermissible reason. As the Supreme Court itself has cautioned, "where holdings of the Court are not at issue" it is "generally undesirable to dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). Needless to say, because the same principle applies to the Federal Reporter, we similarly decline to attach decisive significance to our own references to "the agency" in *Ryan* and *Bennett* where, as noted above, the issue we face here was not raised.

In concluding that *Egan* applies only to the Security Division, we fully understand that non-Security Division employees play a role in identifying security risks. But the government's justiciability argument, embraced by the dissent, asks us to go well beyond *Egan*'s reasoning, as well as its narrow holding. The decision by a non-expert employee to refer a colleague for a potential security investigation is categorically unlike the predictive judgment made by "appropriately trained adjudicative personnel" who make security clearance decisions pursuant to delegated Executive authority and subject to established adjudicative guidelines designed to channel their discretion. Exec. Order No. 12,968, § 3.1(b), 60 Fed. Reg. at 40,250; 32 C.F.R. § 147.1–147.15 (setting forth guidelines). Given that nothing in *Egan* requires us to extend its principles beyond employees possessing the requisite training and experience, we decline to do so, thus preserving to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation. Moreover, although the government believes that without *Egan*'s protection, employees outside the Security Division will be reluctant to make referrals, we think that concern too speculative to extend *Egan*'s justiciability doctrine beyond its core concern.

Having identified the relevant agency decisionmaker for our justiciability inquiry, we turn to the second question, namely, whether the jury, in adjudicating Rattigan's Title VII retaliation claim, was put in the position of reviewing the substance of discretionary Security Division decisions. According to Rattigan, this question has an easy answer: because his security clearance "was not revoked but upheld, . . . [t]he jury's determination that the OIO employees' actions were retaliatory is . . . consistent with the Security Division's ultimate decision that Rattigan was not a security risk." Appellee's Br. 29–30. The problem with this argument is that

it focuses only on the Security Division's bottom-line judgment while overlooking its antecedent decision to initiate an investigation. Prior to concluding that Rattigan posed no risk to national security, the Division had to determine whether Leighton's observations, as presented to the Division in the electronic communication, were sufficiently serious to justify further inquiry. It concluded they were, and such a threshold decision by the Security Division to investigate is surely the kind of judgment *Egan* commits to Division discretion. *Cf. Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996).

Rattigan nowhere disputes that the Security Division's decision to investigate is off limits for judicial review. He insists, however, that the Division's decision to launch an investigation was not at issue because he never asked the jury to question the reasonableness of that investigation. Up to a point, Rattigan is correct: nothing about his claim required him to attribute retaliatory animus to Security Division employees, and our review of the record satisfies us that his presentation to the jury focused on the behavior of OIO employees only. *See, e.g.*, Trial Tr. at 21 (July 21, 2009) (opening statement of counsel for Rattigan). Indeed, the district court, consistent with the government's request, instructed the jury that for Rattigan to sustain his retaliation claim, he did not have "to prove that the Security Division personnel who authorized the investigation were motivated by . . . retaliatio[n] . . . if [he] prove[d] . . . that these personnel were influenced by the referral provided by OIO personnel, and that the stated reason the OIO provided for the referral was" pretext for retaliation. Looking at the entire record, however, we still see an *Egan* problem.

Although the district court properly distinguished between OIO employees and specially trained Security

Division employees, it believed—and we shall say more about this later—that the OIO referral alone was not actionable under Title VII. As a result, it allowed the jury to review the decisions of the Security Division itself. Indeed, during the course of the trial, the district court expressly recognized that Security Division Section Chief Edward Shubert had become the relevant "decision-maker." Trial Tr. at 40 (July 27, 2009). For example, in admitting evidence that Rattigan had passed a random polygraph examination, the court explained that although there was scant reason to believe Pyszczymuka should have known about the polygraph prior to making the referral because the matter was "just not part of his job or part of his Department," there was reason to think Shubert may have known about it, making the evidence relevant to establish what Shubert "knows and doesn't know and what went into his consideration, or didn't go into his consideration." *Id.* Moreover, consistent with its identification of Shubert as the "decision-maker," the district court made liability turn on the Security Division's decision to investigate, instructing the jury that Rattigan had to prove that the "defendant *initiated the Security Division investigation* because [Rattigan] made allegations of . . . discrimination." (emphasis added). Likewise, the verdict form asked the jury whether Rattigan "prove[d] . . . that the reason that defendant *initiated the FBI's Security Division investigation* was to retaliate against [Rattigan] for having engaged in protected activity . . . ." (emphasis added).

Taken together, the district court's evidentiary rulings, jury instruction, and verdict form invited the jury to look into Shubert's decisionmaking process and assess his reasons for authorizing the investigation. According to Rattigan, however, the jury had nothing to second-guess because Shubert engaged in no independent decisionmaking. Instead, "[g]iven the supervisory rank and standing of the biased

individuals who made the referral," Rattigan claims, Shubert felt he had no choice but to approve an investigation. Appellee's Br. 47. But Shubert testified to the contrary, explaining that OIO supervisors have no authority to initiate security investigations and that not all referrals lead to such investigations. *See* Trial Tr. at 26, 35 (July 27, 2009) (testimony of Edward Shubert). And far from indicating, as Rattigan contends, that Shubert simply deferred to Pyszczymuka after Pyszczymuka forwarded Leighton's electronic communication, Shubert testified that although he conducted no independent factfinding, he reviewed Leighton's observations and decided, based on FBI security clearance guidelines, to authorize an investigation. More specifically, Shubert testified that Leighton's communication raised concerns about "foreign influence" and that his claim that Rattigan and other FBI agents may have cavorted with prostitutes raised red flags about "personal conduct." *Id*. at 31–32. Although Shubert based his concern about foreign influence on the electronic communication "as a whole," he specifically mentioned Leighton's contention that Saudi intelligence officials gave Rattigan gifts and sought to find him a "suitable wife," as well as Leighton's assertion that Rattigan restricted the access of other FBI agents to Saudi officials and made those officials his only point of contact during his pilgrimage to Mecca. *Id.* at 31–34.

In short, because *Egan* bars Rattigan from predicating liability on the actions of the Security Division, and because the jury, notwithstanding the "influence by non-decisionmakers" instruction, was allowed—indeed invited—to scrutinize the Division's decisionmaking, we shall vacate the judgment entered in favor of Rattigan.

**III.**

Based on the foregoing, the government would have us not only set aside the verdict but also order the case dismissed. But given our conclusion that challenges to OIO referral decisions fall outside *Egan*, and given that, as we shall explain, the OIO referral itself can qualify as a materially adverse action under Title VII, Rattigan's case can proceed so long as the jury is not put in the position of second-guessing the Security Division. Dismissing the complaint is thus unwarranted because it would deprive Rattigan of his cause of action due to evidentiary rulings and jury instructions we have now concluded were flawed. *See, e.g.*, *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1261 (D.C. Cir. 2010) (vacating the judgment and remanding for a new trial because flawed jury instruction misstated the standard for scienter under the False Claims Act).

We begin with the question of whether the OIO referral can qualify as a materially adverse action under Title VII. As the Supreme Court recently explained, Title VII's retaliation provision "cover[s] a broad range of employer conduct" that extends beyond the statute's substantive antidiscrimination provision. *Thompson v. N. Am. Stainless, LP*, __U.S.__, 131 S. Ct. 863, 868 (2011); *see also Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (holding that the federal government faces the same standards of liability for retaliation under Title VII as a private employer). In the retaliation context, a materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal quotation marks omitted). Whether a particular adverse action satisfies the materiality threshold is generally a jury question, with our role limited to determining whether, viewing the

evidence in the light most favorable to the plaintiff, a reasonable jury could find the action materially adverse. *See Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (explaining, in the context of claim that reassignment of duties was materially adverse, that "whether a particular reassignment of duties constitutes an adverse action is generally a jury question" (internal quotation marks and alterations omitted)).

Viewing the evidence in this case in the light most favorable to Rattigan, we have no doubt that a reasonable jury could find that OIO's security referral itself might "well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57. The referral alone created the very real possibility not only that Rattigan would face a stressful and potentially reputation-damaging investigation, but also that the FBI would revoke his security clearance and terminate his employment. *See, e.g.*, Trial Tr. at 82 (July 27, 2009) (testimony of Michael Pyszczymuka) (acknowledging that being the subject of a security investigation could harm an FBI agent's career); Trial Tr. at 53–54 (July 22, 2009) (testimony of Cheryl Tucker) (recognizing the career-damaging effect a security investigation could have for an agent like Rattigan who was involved in the FBI's sensitive and important inquiry into the September 11 attacks). In our view, a reasonable jury could conclude that these ominous prospects are more than sufficient to deter a reasonable employee from filing a discrimination complaint. *See Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010) (holding that a supervisor's issuance of a negative written interim assessment and performance improvement plan constituted materially adverse action because, under applicable agency regulations, the negative rating assessment and accompanying plan "*could expose* [the plaintiff] to removal, reduction in grade, withholding of

within grade increase or reassignment" (emphasis added) (internal quotation marks omitted)); *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (concluding that a lengthy disciplinary investigation by the FBI's Office of Responsibility that "placed a cloud over [plaintiff's] career" was materially adverse "[b]ecause a reasonable jury could find that *the prospect* of such an investigation could dissuade a reasonable employee from making or supporting a charge of discrimination" (emphasis added)); *accord Rattigan I*, 604 F. Supp. 2d at 52 ("[W]hether an action is 'materially adverse' is determined by whether it holds a deterrent *prospect* of harm, and not by whether the harm comes to pass or whether any effects are felt in the present.").

Moreover, this conclusion depends not at all on the actions that the Security Division takes: the possible negative repercussions of an OIO referral could deter an employee from filing a complaint even though OIO has no control over whether the Security Division undertakes an investigation or ultimately decides to revoke a security clearance. The situation is to some extent analogous to the filing of a criminal complaint for retaliatory purposes, which may qualify as a materially adverse action under Title VII. *See White*, 548 U.S. at 64 (favorably citing a Tenth Circuit decision "finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination" (citing *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984 (10th Cir. 1996))); *see also Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008) (noting that "the Supreme Court [has] indicated that a false report to government authorities can constitute retaliation," and accordingly finding actionable the filing of a false report to the D.C. Office of Unemployment Compensation contesting the employee's unemployment benefits). This is so even though it is the prosecutor, not the employer, who decides

whether to pursue criminal charges after the complaint is filed. Like the filing of a criminal complaint, an OIO security referral could "deter victims of discrimination from complaining to the EEO[]," thus interfering with employees' "unfettered access to Title VII's remedial mechanisms." *White*, 548 U.S. at 68 (internal quotation marks omitted).

Given that OIO's referral may qualify as a materially adverse action and that such an action falls outside *Egan*, we shall remand to give Rattigan an opportunity to prove his case. Of course, the district court will have to ensure that the jury does not second-guess the Security Division's decision to initiate the investigation. For even if the charge of retaliation focuses only on OIO's referral, the risk remains that unless the district court takes precautions, the jury could nonetheless second-guess the Security Division's decision to initiate the investigation. To determine whether OIO's referral rested on legitimate security concerns as opposed to retaliatory animus, the jury must weigh the strength of the evidence Leighton submitted in support of his claim that Rattigan might pose a security risk. But weighing the evidence of Rattigan's behavior as reported in Leighton's electronic communication and deciding whether it justified an investigation is also what the Security Division did, and under *Egan* the jury must not revisit the Division's judgment on this point. *Cf. Becerra*, 94 F.3d at 149 ("The reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made."). Moreover, the risk of second-guessing remains despite the Division's ultimate conclusion that Rattigan posed no security threat. The standards for deciding whether Leighton's observations about Rattigan merited further inquiry and whether Rattigan's security clearance should be revoked were necessarily and obviously different, and it is perfectly plausible for the Division to have believed that Leighton's claims warranted an

investigation yet, following that investigation, to have concluded that suspicions about Rattigan were unfounded.

A simple admittedly stylized hypothetical illustrates the potential problem. Suppose OIO's security referral had raised a single allegation: that Rattigan occasionally wore Saudi national clothing while in the U.S. embassy. Suppose also that Shubert reviewed this allegation, decided it raised questions about foreign influence, and initiated an investigation. And suppose finally that the investigation, though verifying that Rattigan had in fact worn Saudi clothing, concluded that the concerns about him were unfounded because no other evidence suggested inappropriate foreign influence. In response to a Title VII claim by Rattigan contending that OIO's referral was retaliatory, OIO officials would presumably argue that the referral was motivated by a legitimate non-retaliatory reason—namely, their concern that Rattigan's office attire signaled that he might represent a national security risk. To assess whether that asserted reason was pretextual under *McDonnell Douglas*, the jury would be asked, either expressly or impliedly, to evaluate its validity. *See Ryan*, 168 F.3d at 524 (" 'Even when the court faces independent evidence of a discriminatory motive, it is still necessary to weigh the validity of the defendant's proffered reasons when deciding if they are pretextual.' " (quoting *Brazil*, 66 F.3d at 197)). But that concern—that Rattigan's wearing of Saudi clothing was suspicious—was the very reason (in the hypothetical) the Security Division launched its investigation. Therefore, putting the jury in a position of weighing whether the wearing of Saudi clothing raised a legitimate national security concern could, contrary to *Egan*, invite it to question the Security Division's judgment that Rattigan's behavior merited further inquiry.

To be sure, when the jury evaluates the motives behind a security referral, it sits in a very different position than do Security Division officials reviewing allegations and deciding whether to investigate. Whereas such officials will frequently have to make investigation decisions based on uncorroborated and acontextual allegations received from non-Security Division employees, the plaintiff may be able to introduce evidence to convince the jury that those employees included in their referral accusations that they knew or should have known were false or misleading. Such evidence, if credited, will provide compelling reasons for the factfinder to conclude that the employees' asserted security reasons for the referral were pretextual without ever calling into doubt any Security Division judgment. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (explaining that one way an employee may show that an employer's stated reason for an action was pretextual is to "attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the [action]").

Thus, although Title VII challenges to security referrals could in some circumstances invite the jury to question Security Division judgments about the seriousness of security concerns, that is far from inevitable. Ultimately, it falls to the district court to guard against this risk of violating *Egan*. To do so, the district court could, for example, instruct the jury to assume that the reasons the Division gave for commencing an investigation—provided those reasons did not rest on false or misleading allegations—fully justified undertaking the investigation. We recognize that limitations required to ensure compliance with *Egan* may make it impossible for some plaintiffs to mount evidence sufficient to allow a reasonable jury to believe retaliation had occurred. In such cases, the district court will need to enter judgment for the government. *Cf. In re Sealed Case*, 494 F.3d 139, 144–45

(D.C. Cir. 2007) (recognizing in state secrets context that where plaintiff is unable to establish prima facie case without the use of privileged information, lack of evidence requires dismissal).

Here, whether Rattigan has adduced sufficient evidence for his claim to proceed without running into *Egan* is a question we leave in the district court's able hands. Having presided over the trial and several years of motions practice, the district court is in the best position to decide whether, given the record and any cautionary instructions and evidentiary rulings it believes necessary, Rattigan's case can go forward without putting the jury in the position of second-guessing the Security Division. *See Jones*, 557 F.3d at 681 ("Given the state of the record and the factual intricacies intertwined with [plaintiff's] allegations, we are unwilling to delve into questions that the district court did not address." (internal quotation marks and alterations omitted)).

## IV.

For the foregoing reasons, we vacate the judgment and remand for further proceedings consistent with this opinion.

*So ordered.*

KAVANAUGH, *Circuit Judge*, dissenting: In *Department of Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court held that the Navy's decision to deny Egan a security clearance could not be reviewed in the course of his personnel action against the Navy. Justice Blackmun's opinion for the Court reasoned that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Id.* at 529. The *Egan* Court thus precluded agency employees such as Egan from pursuing personnel actions against their agency employers when doing so would entail second-guessing the agency's security clearance decision. The Court recognized that Congress could override the presumption of unreviewability that attached to security clearance decisions, but it said that Congress had not done so with respect to personnel suits like Egan's. *See id.* at 530.

The majority opinion here, however, reads *Egan* more narrowly. Under the majority opinion, security clearance decisions are committed not "to the broad discretion of the agency responsible," *id.* at 529, but only to some agency employees who possess the "requisite training and expertise." Maj. Op. at 15. Under the majority opinion's scheme, courts may not review the decisions of agency employees who initiate investigations or grant, deny, or revoke clearances, but courts may review the decisions of agency employees who *report* security risks. The majority opinion's slicing and dicing of the security clearance process into reviewable and unreviewable portions is nowhere to be found in *Egan*, and does not reflect the essential role that the reporting of security risks plays in the maintenance of national security.

\* \* \*

To begin with, contrary to the majority opinion's approach, the Supreme Court in *Egan* consistently referred to

"the agency" – not to certain employees within an agency – as the decisionmaker that may not be second-guessed in security clearance cases. Consider the following from *Egan*:

- "[T]he grant of security clearance to a particular employee . . . is committed by law to the appropriate agency of the Executive Branch." *Egan*, 484 U.S. at 527.
- "[C]ertain civilian agencies . . . were entrusted with . . . protecting . . . information bearing on national security." *Id.* at 527-28.
- "Presidents . . . have sought to protect sensitive information . . . by delegating this responsibility to the heads of agencies." *Id.* at 528.
- "Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529.
- "[A]n agency head . . . should have the final say in deciding whether to repose his trust in an employee who has access to [classified] information." *Id.*
- "[T]he Senate and House Committees . . . gave no indication that an agency's security-clearance determination was now to be subject to review." *Id.* at 531 n.6.
- "Placing the burden on the Government" would involve "second-guessing the agency's national security determinations." *Id.* at 531.

In the face of the recurring "agency" theme in *Egan*, the majority opinion here concludes that *Egan* protects only the actions of certain agency employees. The majority opinion relies on a single sentence in *Egan* that mentions "those with

the necessary expertise in protecting classified information." *Egan*, 484 U.S. at 529. But in that sentence, the *Egan* Court was simply contrasting the expertise of agencies with that of outside reviewing bodies, not implying that courts should draw a reviewability line based on which members of an agency possessed certain amounts of expertise. The full quote from *Egan* makes that clear:

> Predictive judgment of this kind must be made by those with the necessary expertise in protecting classified information. For reasons too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of *the agency* responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether *the agency* should have been able to make the necessary affirmative prediction with confidence.

*Id.* (citations, alterations, and internal quotation marks omitted) (emphasis added).

Nothing in *Egan*'s language suggests that the Supreme Court was only barring review of the security clearance actions of "employees possessing the requisite training and experience," as the majority opinion here contends. Maj. Op. at 15. Nor have this Court's decisions applying *Egan* drawn the line newly drawn in the majority opinion. Following the Supreme Court's lead, we have referred to the decisionmaking process of the agency as a whole, not to certain parts of an agency, in employment discrimination cases involving security clearance decisions. *See, e.g.*, *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005)

("trier of fact" may not "evaluate the validity of the agency's security determination"); *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999) ("*Egan* applies in a Title VII action to preclude . . . a discrimination claim . . . resulting from an agency security clearance decision").

Moreover, the Supreme Court in *Egan* protected the security clearance process as a whole. The Court did not suggest that courts could review distinct parts of that process. The majority opinion here, however, says that only the initiation of security clearance investigations and the grant, denial, or revocation of clearances are within the *Egan* rule. In the majority opinion's view, the reporting of security risks is not within the *Egan* rule. I do not find that distinction in *Egan*. Nor do I think it makes much sense. Investigations and revocations of security clearances will often be prompted by reports of misconduct. Reports of misconduct are an essential part of the overall process of maintaining national security and preventing those who may be security risks from accessing sensitive government information. *Egan* protects the front end of the security clearance process – including reports of possible security risks – as much as it protects the back end.

One powerful indication that the reporting of security risks is important to national security and falls within the *Egan* rule is that the President himself has required such reporting. In an executive order issued by President Clinton and still in effect, all federal employees with security clearances must make a predictive judgment about what constitutes suspicious behavior and report any such behavior for investigation: "Employees are encouraged and expected to report any information that raises doubts as to whether another employee's continued eligibility for access to

classified information is clearly consistent with the national security." Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. 40,245, 40,253 (Aug. 2, 1995). *Egan* recognized that the "authority to protect such [national security] information falls on the President as head of the Executive Branch and as Commander in Chief." *Egan*, 484 U.S. at 527. The *Egan* rule thus covers reports made under President Clinton's executive order. *See id.* at 527-30. The majority opinion, however, would allow courts to second-guess the decisions of agency employees who report security risks under President Clinton's executive order. I cannot square that with *Egan*.

I appreciate and share the majority opinion's concern about deterring false or wrongful reports that in fact stem from a discriminatory motive. But there are a host of sanctions that deter an agency employee from engaging in such behavior. *See, e.g.*, 71 Fed. Reg. 64,562, 64,563 (Nov. 2, 2006) (Department of Justice "retains the right, where appropriate, to discipline an employee for conduct that is inconsistent with Federal Antidiscrimination and Whistleblower Protection Laws up to and including removal"). And in any event, it is not for us to adjust the rule set forth in *Egan*; that's a decision for the Supreme Court or Congress.

The majority opinion's approach not only causes tension with the Supreme Court's decision in *Egan* and this Court's precedents, but also will create significant practical difficulties. I expect that district courts will find it quite difficult to navigate the instructions set forth in Part III of the majority opinion. *Egan* set forth a simple default rule for courts to follow in the absence of congressional direction otherwise. The complicated process ushered in by the

majority opinion does not comport with the clarity of *Egan*, in my respectful judgment.

\* \* \*

The rule that the Supreme Court announced in *Egan* applies "unless Congress specifically has provided otherwise." 484 U.S. at 530. If Congress wishes to re-strike the balance between personnel and employment discrimination laws on the one hand and national security on the other, it is free to do so – either broadening or narrowing the scope of the protection for agencies' security clearance decisions. Until Congress does so, however, I would apply *Egan* according to its terms. Here, Rattigan claims that FBI officials improperly decided to report him to security clearance investigators. Under *Egan*, we cannot second-guess the FBI's decision. For that reason, Rattigan's suit faces an insurmountable bar, and we must dismiss it.

I respectfully dissent.