# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 7, 2011         Decided July 10, 2012

No. 10-5014

WILFRED SAMUEL RATTIGAN,
APPELLEE

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL, UNITED STATES
DEPARTMENT OF JUSTICE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-02009)

On Petition for Rehearing

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Tony West*, Assistant U.S. Attorney, *Ronald C. Machen Jr.*, U.S. Attorney, and *Marleigh D. Dover*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Jonathan C. Moore* argued the cause for appellee. With him on the brief was *James R. Klimaski*.

Before: ROGERS, TATEL, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

TATEL, *Circuit Judge*: Appellee, an employee of the FBI, alleges that FBI officials retaliated against him in violation of Title VII of the Civil Rights Act of 1964 when, by reporting unfounded security concerns to the Bureau's Security Division, they prompted an investigation into his continued eligibility for a security clearance. In our earlier opinion in this case, *Rattigan v. Holder*, 643 F.3d 975 (D.C. Cir. 2011), we held that although Supreme Court and D.C. Circuit precedent shields the Security Division's security clearance-related decisions from judicial review, the Title VII claim could nonetheless go forward so long as it challenged only the reporting of appellee to the Security Division and not the Division's decision to investigate. On rehearing, however, the government has persuaded us that our earlier decision was too broad. For the reasons set forth below, we narrow the scope of Title VII liability in these circumstances and remand for further proceedings consistent with this opinion.

## I.

As recounted in our earlier opinion, Plaintiff-Appellee Wilfred Rattigan is a black male of Jamaican descent who has converted to Islam. *See Rattigan*, 643 F.3d at 977. In 1999, the FBI transferred Rattigan, a long-term FBI employee, to the Office of the Legal Attaché at the United States Embassy in Riyadh, Saudi Arabia. Serving first as the Office's Assistant Legal Attaché and then as Legal Attaché (Legat), Rattigan functioned as the FBI's primary liaison to the Saudi intelligence service and reported to the FBI's Office of

International Operations (OIO) in Washington, D.C. During his tenure in the Riyadh office, Rattigan made several complaints of race- and national origin-based discrimination. Specifically, at an office-wide meeting in October 2001, Rattigan accused OIO supervisors Cary Gleicher, Michael Pyszczymuka, and Leslie Kaciban of discrimination and later pursued claims against them with the Equal Employment Opportunity (EEO) Office.

Around the same time, in November 2001, OIO Special Agent Donovan Leighton, sent by Gleicher on a twenty-one day assignment to Riyadh, purportedly grew suspicious about Rattigan's behavior and management of the office. In particular, Leighton worried that certain behavior, such as Rattigan's appearance at the U.S. Embassy in "full Saudi Arabian costume," suggested that Rattigan might be "inappropriately under the influence of his Saudi counterparts." Trial Tr. at 58, 60 (July 23, 2009). Following a short vacation, Leighton returned to the OIO Washington Office, where he had further dealings with Rattigan that allegedly led him to become more concerned. After consulting his OIO supervisors, Leighton documented his concerns in an "electronic communication" (EC), i.e., a memorandum written for internal use, which he sent to OIO supervisor Pyszczymuka for review. Pyszczymuka then forwarded the EC to the Security Division, requesting a review of Leighton's observations. Following its investigation, the Division concluded that the potential security risks alleged by Leighton "lack[ed] corroboration and [were] unfounded." Memorandum from Maureen Chelak, Sec. Div. Analytical Integration Unit 4 (Sept. 18, 2002). Accordingly, the Division closed its investigation, and Rattigan retained his security clearance.

In 2004, Rattigan filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., alleging, among other things, that the decision to refer Leighton's purported concerns to the Security Division, thus prompting a security clearance investigation, amounted to unlawful retaliation for Rattigan's pursuit of discrimination claims. The jury found for Rattigan on the retaliation claim, ultimately awarding him $300,000 in damages. On appeal, the government argued primarily that Rattigan's retaliation claim was non-justiciable under the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), which we have interpreted to bar judicial review of adverse employment actions based on the denial or revocation of a security clearance. *See Bennett v. Chertoff*, 425 F.3d 999, 1001 (D.C. Cir. 2005) ("[E]mployment actions based on denial of security clearance are not subject to judicial review, including under Title VII."); *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999) (holding that "under *Egan* an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII").

We held that "*Egan* shields from review only those security decisions made by the FBI's Security Division," whose employees are trained and authorized to make security clearance determinations, and "not the actions of thousands of other FBI employees who, like Rattigan's OIO supervisors, may from time to time refer matters to the Division." *Rattigan*, 643 F.3d at 983. We thus concluded that Rattigan's claim based on the OIO reporting and referral could proceed "so long as the jury is not put in the position of second-guessing the Security Division." *Id.* at 986. But finding that the district court's instructions invited the jury to second guess the Security Division's decision to initiate an investigation, we vacated the judgment and ordered the case remanded for further proceedings.

The government filed a petition for rehearing and rehearing en banc, arguing that our decision conflicts with both *Egan* and reporting obligations established by the President. As the government points out, Executive Order 12,968, which sets forth security clearance standards and procedures, states that employees granted access to classified information "are encouraged and expected to report *any information* that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security." Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. 40,245, 40,253 (Aug. 2, 1995) (emphasis added). According to the government, the prospect of Title VII liability for reporting-based claims could deter employees from reporting information they find doubtful or difficult to verify— information that can be critical to the Security Division's ability to conduct an effective investigation. Persuaded that this argument merited further consideration, we granted the petition for panel rehearing and requested briefing on the scope of *Egan*'s bar on judicial review of security clearance decisions, the potential for Title VII liability to chill reporting of security concerns to the Security Division, and the consequences of narrowing Title VII liability by limiting it to claims based on referrals of knowingly false information.

## II.

In *Egan*, the Supreme Court made clear that the general presumption favoring judicial review "runs aground when it encounters concerns of national security," as in cases "where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." 484 U.S. at 527. As explained in our prior opinion, however, we do not believe that *Egan* insulates from Title VII *all* decisions that might bear upon an employee's eligibility to

access classified information. Rather, the Court in *Egan* emphasized that the decision to grant or deny security clearance requires a "[p]redictive judgment" that "must be made by those with the necessary expertise in protecting classified information." *Id.* at 529. Likewise, under Executive Order 12,968, the decision to grant or deny access to classified information must be "based on judgments by appropriately trained adjudicative personnel." Exec. Order No. 12,968, § 3.1(b), 60 Fed. Reg. at 40,250. It is this expert, predictive judgment made by "appropriately trained" personnel that *Egan* insulates from judicial review. *Rattigan*, 643 F.3d at 983. At the FBI, such "appropriately trained" personnel work in the Security Division. By contrast, OIO officials "have neither the authority nor the training to make security clearance decisions." *Id.* Accordingly, finding that "[t]he decision by a non-expert employee to refer a colleague for a potential security investigation is categorically unlike the predictive judgment made by 'appropriately trained adjudicative personnel' who make security clearance decisions pursuant to delegated Executive authority and subject to established adjudicative guidelines," we held that *Egan*'s bar on judicial review extends only to security clearance-related decisions made by the Security Division itself and not to decisions by other FBI employees to report their concerns to the Division. *Id.* at 984 (quoting Exec. Order No. 12,968, § 3.1(b), 60 Fed. Reg. at 40,250).

On rehearing, the government argues that decisions to report security concerns come within *Egan*'s scope because they "involve precisely the same type of predictions about risks to national security" as the decision to grant or deny clearance, Appellant's Reh'g Br. 6; *see also* Dissenting Op. at 5, and because the Executive Order's reporting mandate reflects a "categorical determination that *all* employees with access to classified information have the necessary 'training

and experience' to *report* security concerns," Appellant's Reh'g Br. 21. But this argument is undercut by the government's insistence—in the very same brief—that Executive Order 12,968 requires employees to report "*any* information that raises doubts," Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253 (emphasis added), without making a judgment as to the information's veracity or relevance to national security. Indeed, the government explains that "[a]lthough plaintiff may argue that Leighton or other OIO officials 'should have known' that some of the facts included in his EC did not raise significant security issues, *it was not their place to make that judgment* or to undertake a mini-investigation to verify those facts." Appellant's Reh'g Br. 32–33 (emphasis added); *see also* Reh'g Pet. 14 n.3 (suggesting that employees should report even "information the employee might believe is not directly relevant or accurate"). In other words, employees outside the Security Division are expected to refrain from making sensitive, predictive judgments and it is "not their place" to make the kinds of decisions that *Egan* shields from review. Given this, and for the reasons set forth in our earlier opinion, we adhere to our holding that *Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns.

## III.

In addition to its arguments about the scope of *Egan*, the government urges us to reconsider our decision on grounds that, in the judgment of "the Executive Branch agencies that handle security clearance issues," preserving Title VII liability for security reporting claims will impair the ability of the Security Division to fulfill its Executive Order 12,968 responsibility by "chill[ing] the timely and adequate reporting

of security issues." Reh'g Pet. 13. As we understand it, the government's point is this: by imposing a standard for Title VII liability that conflicts with the reporting standard set forth in Executive Order 12,968, our earlier opinion creates a risk that an employee's compliance with the Order could provide a basis for Title VII liability—a risk that could chill reporting and thus undermine the ability of the Security Division to fulfill its responsibilities to make fully informed security-clearance decisions.

The government's argument rests on section 6.2(b) of the Executive Order, which, as explained above, states that employees with security clearances "are encouraged and expected to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security." Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253. According to the government, section 6.2(b) adopts a "broad margin of error in favor of national security," Appellant's Reh'g Br. 19, requiring employees to report "*any* information that raises doubts," Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253 (emphasis added), even if that information is mere rumor or has only uncertain relevance to national security. This broad reporting mandate reflects the Executive's judgment that "[t]he reliability of final security clearance decisions . . . necessarily depends on the proper officials having full and complete access to all potentially relevant information, including information the employee might believe is not directly relevant or accurate." Reh'g Pet. 14 n.3; *see also* Appellant's Reh'g Br. 30.

The government is concerned that our earlier decision conflicts with this broad reporting standard because it would allow a jury to infer pretext—and find Title VII liability—from an employee's decision to report dubious or potentially

irrelevant information. *See Rattigan*, 643 F.3d at 987 ("To determine whether OIO's referral rested on legitimate security concerns as opposed to retaliatory animus, the jury must weigh the strength of the evidence Leighton submitted in support of his claim that Rattigan might pose a security risk."); *id.* at 988 (plaintiff may show pretext by "convinc[ing] the jury that [the reporting] employees included in their referral accusations that they knew *or should have known* were false or misleading" (emphasis added)). The government points out, moreover, that a jury would evaluate the plaintiff's pretext evidence under the preponderance of the evidence standard—a standard the Supreme Court in *Egan* deemed "inconsistent" with the "clearly consistent with the interests of the national security" standard used in security clearance determinations. 484 U.S. at 531. Because we suggested that a jury could find pretext under a preponderance standard based on its own assessment of the weight and credibility of the information reported, the government warns that our decision will likely deter employees from reporting "*any* information that raises doubts," Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253 (emphasis added), particularly when the information is either questionable or potentially insignificant. This chilling effect on reporting, in turn, could "seriously compromise the integrity of final security clearance decisions," Appellant's Reh'g Br. at 30, because the security clearance process as a whole is "predicated on timely and accurate reporting of even questionable information." *Id.* at 13. The government is also concerned that an employee, fearing that reporting information she "should have known [was] false or misleading" could provide a basis for Title VII liability, *Rattigan*, 643 F.3d at 988, might take it upon herself to investigate and verify the allegations before reporting—an action that could "tip[] off the subject, influence[] possible witnesses, or otherwise impede[] the Security Division's

ability to conduct an effective investigation." Appellant's Reh'g Br. 29.

We find the government's arguments quite powerful, especially given the deference owed "the executive in cases implicating national security," *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926–27 (D.C. Cir. 2003). Specifically, we agree that our earlier decision could indeed discourage critical reporting by permitting jurors to infer pretext based on their own judgment that the information reported was either unlikely to prove true or raised insufficiently weighty security concerns. Such a standard plainly conflicts with Executive Order 12,968's expectation that employees will report even overheard rumors and small details that may ultimately prove irrelevant. Moreover, to the extent that jurors would be called upon to "weigh the strength of the evidence" submitted in support of reported security concerns, *Rattigan*, 643 F.3d at 987, *Egan* suggests that the preponderance standard could lead them to "depart[]" from the "clearly consistent" standard mandated by the President in evaluating the decision to report seemingly insignificant information. *See Egan*, 484 U.S. at 531. And although, as Rattigan points out, only the government can be held liable under Title VII, we agree that the "substantial burdens, loss of privacy, and public humiliation" that accompany litigation, Appellant's Reh'g Reply Br. 13, could nonetheless have a serious chilling effect on individual employees.

Critically for our purposes, this likely chilling effect presents serious *Egan* problems given that Security Division employees, trained to make security clearance decisions and thus covered by *Egan*, need all the evidence they can get to "control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to . . . [have] access to such information," *Egan*,

484 U.S. at 527. The Executive Order encourages broad reporting precisely because the entities charged with making security clearance decisions—here the Security Division—need full access to even unsubstantiated and doubtful information in order to make the sensitive, predictive judgments that *Egan* protects. Although, as explained above, we continue to believe that the reporting decisions at issue in this case fall outside the scope of *Egan*'s protection, we conclude that because broad liability for such reporting could compromise the integrity of decisions that *are* shielded from judicial intrusion, i.e., decisions of the Security Division, allowing such liability would conflict with *Egan*.

The question, then, is whether we must bar reporting and referral claims altogether, as the government urges, or whether we can sufficiently minimize the chilling effect of Title VII liability by narrowing the scope of such claims. We ask this question because it is our duty not only to follow *Egan*, but also to "preserv[e] to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation." *Rattigan*, 643 F.3d at 984; *cf. J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) ("when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective" (internal quotation marks omitted)). Given this, and given that, as explained below, Title VII claims based on *knowingly false* reporting present no serious risk of chill, we believe that claims of knowingly false security reports or referrals can coexist with *Egan* and the Executive Order.

A knowingly false standard, unlike the standard suggested by our earlier opinion, would create no conflict with Executive Order 12,968's broad reporting mandate.

However critical it is for employees to report doubtful or unreliable information, the Security Division cannot possibly be assisted by employees who knowingly report false information—that is, outright lies—about fellow employees. Conceding as much, the government emphasizes that employees can face internal discipline for false or inaccurate reporting. *See* Appellant's Reh'g Br. 8, 30–31. A knowingly false standard, moreover, would obviate any need for jurors to "weigh the strength" of the information reported, *Rattigan*, 643 F.3d at 987, or to second-guess the employee's determination that seemingly doubtful or insignificant information warranted reporting. Under a knowingly false standard, whether the information reported was sufficient to "raise[] doubts," Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253, about the plaintiff's eligibility for a security clearance is irrelevant; the only question is whether the reporting employee actually knew at the time of the reporting that the information he provided was actually false. The limited scope of this inquiry would also alleviate the government's (and *Egan*'s) concerns about conflicting evidentiary standards, for juries would apply the preponderance standard only to determine whether the employee knowingly reported or referred false information and would make no judgments, under any standard, as to whether the plaintiff's continued access to classified information was clearly consistent with national security.

The government objects that even limited Title VII liability for knowingly false reporting would likely have a chilling effect. According to the government, plaintiffs will simply allege knowing falsity in every case, an allegation the government claims is "famously easy to make and difficult to rebut." Appellant's Reh'g Reply Br. 14. Given the ease with which plaintiffs could allege such claims, the government argues, employees might hesitate to report information they

find doubtful, fearing that a plaintiff could argue, and a jury could find, that they knew the information was false when they reported it. As the government sees it, there is no need to make a "policy-based exception" for cases involving fabricated security reports because "such reports are, by definition, already subject to independent review and investigation" through internal agency procedures. Appellant's Reh'g Br. 8. Such procedures, the government tells us, allow agencies to inquire into allegations of knowingly false reporting quickly, confidentially, and with appropriate sensitivity to the wide margin of error mandated by the Executive Order. In contrast, the government claims, Title VII litigation presents a greater risk of chill because of its public nature, the lengthy timeframe of civil cases, and other burdens imposed by litigation. *See* Oral Arg. Rec. 23:25–25:09; Appellant's Reh'g Br. 30–31; Appellant's Reh'g Reply Br. 13–15.

In our view, the government's concerns are insufficient to justify the sweeping immunity from Title VII liability that it seeks. Although civil litigation can impose substantial burdens, internal agency proceedings carry a more immediate threat of discipline, " 'up to and including removal,' " *see Rattigan*, 643 F.3d at 991 (Kavanaugh, J., dissenting) (quoting 71 Fed. Reg. 64,562, 64,563 (Nov. 2, 2006))—a threat that surely creates its own chilling effect. Moreover, contrary to the government's arguments, we see no reason to think that an agency has any greater competence than juries when it comes to determining what a particular person knew at a particular time and whether that person intentionally reported false information about a co-worker. Indeed, making such determinations is the quintessential function of a jury. *See Kansas v. Ventris*, 556 U.S. 586, 594 n.* (2009) ("Our legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing

witnesses[.]"). By contrast, the agency's expertise in security matters and its sensitivity to the Executive's broad reporting standard have little relevance to whether an employee has reported knowingly false information. And though allegations of knowing falsity may be easy to make, they are, in our experience, far from easy to prove. If this evidentiary difficulty fails to deter unfounded claims, district courts can be counted upon to weed them out at summary judgment.

In reaching this conclusion, we are not, as the government suggests, creating a "policy-based exception" for knowingly false reporting claims. Rather, given that *Egan* imposes an absolute bar only on review of Security Division decisions, the limits we place on Title VII liability for *other* decisions must be no broader than necessary to protect the integrity of the Division's security clearance-related responsibilities. In this way, we preserve to the maximum extent possible congressionally mandated protections against and remedies for unlawful retaliation in the workplace. Were we to declare all reporting-based claims nonjusticiable, federal employees could no longer seek redress for the harm caused when a coworker fabricates security concerns in retaliation for statutorily protected activity, and Congress's purpose in enacting Title VII would be frustrated. But we need not grant the government such broad immunity. As explained above, a narrow, knowingly false standard for security reporting claims creates no conflict with Executive Order 12,968. And given the government's representation that agencies have internal procedures for investigating and punishing knowingly false reports, we think that the marginal chilling effect, if any, of allowing such Title VII cases to go forward would be negligible. For all of these reasons, we hold that Rattigan's Title VII claim may proceed only if he can show that agency employees acted with a retaliatory or

discriminatory motive in reporting or referring information that they knew to be false.

## IV.

Both Rattigan and the government argue that were we to adopt a knowingly false standard for security reporting claims under Title VII, there would be no need to remand for further proceedings. For its part, the government argues that the record contains no evidence supporting a claim that OIO officials knowingly referred false information to the Security Division and that remand would therefore be futile. Rattigan sees the record very differently, claiming that the jury effectively found knowingly false reporting and urging us to affirm the district court's judgment on that ground. Neither is correct.

The government opposes remand on the ground that "[t]he basic facts reported in the Leighton EC were largely uncontested at trial, and the only question was what inference of security risk should properly be drawn from those facts." Appellant's Reh'g Br. 32 (citation omitted). As to many of the allegations in Leighton's EC, the government is certainly correct. Rattigan has acknowledged, for instance, that he occasionally wore traditional Saudi clothing to the Embassy and that he restricted interactions between American temporary duty staff and Saudi intelligence personnel—both facts that formed part of the basis for the OIO security referral. Although Rattigan claims that these allegations were in dispute, his evidence suggests only that he had previously explained this behavior to his supervisors and provided an innocent explanation for his conduct. For example, Rattigan points out that he had explained to OIO management that Saudi personnel would view frequent meetings with temporary staff as an affront and that he therefore chose to limit such meetings in order to preserve good relations with

the Saudi intelligence service. While this may indicate that OIO officials had little reason to believe that Rattigan's actions raised legitimate security concerns—an issue that has no relevance under the knowingly false standard—it does not suggest that Leighton reported or that OIO officials referred factual information they knew to be false. The same can be said of the allegations that Rattigan dressed in traditional Saudi clothing, that the Saudi intelligence service attempted to find him a wife, and that he could be contacted only through the Saudi intelligence service while on the Haaj.

Nonetheless, our review of the record suggests that there may be evidence to support a claim that Leighton or other OIO officials chose to report other information that they knew to be false. For example, Leighton's EC states that Rattigan hosted wild parties attended by "so-called 'nurses,' " who Leighton claims were described in a manner suggesting "that the term 'nurses' was being used by Legat Rattigan as a euphemism for 'prostitutes.' " Leighton EC, at 2. In support of his claim that this allegation was knowingly false, Rattigan contends that it was widely known by his co-workers, including OIO staff, that he was dating—and later married—a woman who was in fact a nurse. Given this, Rattigan claims, Leighton and his OIO supervisors knew that his suggestion that the nurses might be prostitutes was false. The government responds that Leighton's report only recounted various conversations that suggested to Leighton that the "nurses" might be prostitutes. According to the government, because Rattigan offers no evidence suggesting that Leighton fabricated the details of these conversations, Rattigan cannot establish any false reporting. But this argument ignores Rattigan's contention that Leighton and other OIO officials *knew* that Rattigan was dating a woman who actually was a nurse. *See* Appellee's Reh'g Br. 19–20; *see also* Manneson Dep. 29–30 (deposition of Rattigan's wife describing

meetings with Rattigan's co-workers). Moreover, although Leighton's EC states that he "was told" that Rattigan had hosted a party "in which he and two other [FBI employees] had had sexual relations with one or more of the so-called 'nurses,'" Leighton EC, at 2, the Security Division investigation concluded that "[n]one of the personnel interviewed could offer any information which would support SSA Leighton's allegation that Legat Rattigan, along with several other [temporary duty] personnel, engaged in sexual relations with these women." Memorandum from Maureen Chelak, Sec. Div. Analytical Integration Unit 3 (Sept. 18, 2002). All this suggests that Rattigan may be able to prove that (1) no one "told" Leighton that Rattigan hosted parties in which he and others engaged in sexual relations with "nurses," and that (2) because Leighton and other OIO officials knew that Rattigan's girlfriend and her co-workers were in fact nurses, the claim that circumstances suggested they might instead be prostitutes was knowingly false.

At this stage, we have no need to determine whether the record evidence is sufficient to allow a reasonable jury to conclude that Leighton or his OIO supervisors knowingly reported or referred false factual allegations to the Security Division. Because we set forth this knowingly false standard for the first time on appeal, Rattigan had little reason to thoroughly develop evidence of knowing falsity in the district court. Given this, and given that the record contains some evidence that could form the basis for a claim of knowingly false security reports, we shall remand for the district court, after permitting any necessary discovery, to determine in the first instance whether there is sufficient evidence of knowing falsity to allow Rattigan to bring his claim before a jury.

18

## V.

For the foregoing reasons, we vacate the district court judgment and remand for further proceedings consistent with this opinion. Our earlier opinion, *Rattigan*, 643 F.3d 975, remains in effect to the extent consistent with this opinion.

*So ordered.*

KAVANAUGH, *Circuit Judge*, dissenting: Although slightly tweaking its analysis in response to the Government's petition for rehearing, the majority opinion still suffers from a basic flaw. The majority opinion continues to insist that some agency security clearance decisions are judicially reviewable. In my respectful view, the majority opinion's conclusion cannot be squared with the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988).

In *Egan*, the Supreme Court held that the Navy's decision to deny Egan a security clearance could not be reviewed in the course of his personnel action against the Navy. Justice Blackmun's opinion for the Court reasoned that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Id.* at 529. The *Egan* Court thus precluded agency employees such as Egan from pursuing personnel actions against their agency employers when doing so would entail second-guessing the agency's security clearance decision. The Court recognized that Congress could override the presumption of unreviewability that attached to security clearance decisions, but it said that Congress had not done so with respect to personnel suits like Egan's. *See id.* at 530.

The majority opinion here, however, reads *Egan* far more narrowly. Under the majority opinion, security clearance decisions are committed not "to the broad discretion of the agency responsible," *id.* at 529, but only to some "appropriately trained" employees within the agency. Maj. Op. at 6 (quoting *Rattigan v. Holder*, 643 F.3d 975, 983 (D.C. Cir. 2011)). Under the majority opinion's new-fangled scheme, courts may not review the decisions of agency employees who initiate investigations or grant, deny, or revoke clearances, but courts may review the decisions of agency employees who *report* security risks. The majority opinion's slicing and dicing of the security clearance process

into reviewable and unreviewable portions is nowhere to be found in *Egan*, and it does not reflect the essential role that the reporting of security risks plays in the maintenance of national security.

* * *

To begin with, contrary to the majority opinion's approach, the Supreme Court in *Egan* consistently referred to "the agency" – not to certain employees within an agency – as the decisionmaker that may not be second-guessed in security clearance cases. Consider the following from *Egan*:

- "[T]he grant of security clearance to a particular employee . . . is committed by law to the appropriate agency of the Executive Branch." *Egan*, 484 U.S. at 527.
- "[C]ertain civilian agencies . . . were entrusted with . . . protecting . . . information bearing on national security." *Id.* at 527-28.
- "Presidents . . . have sought to protect sensitive information . . . by delegating this responsibility to the heads of agencies." *Id.* at 528.
- "Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529.
- "[A]n agency head . . . should have the final say in deciding whether to repose his trust in an employee who has access to [classified] information." *Id.* (citation omitted).
- "[T]he Senate and House Committees . . . gave no indication that an agency's security-clearance

determination was now to be subject to review." *Id.* at 531 n.6.

- "Placing the burden on the Government" would involve "second-guessing the agency's national security determinations." *Id.* at 531.

In the face of the recurring "agency" theme in *Egan*, the majority opinion here concludes that *Egan* protects only the actions of certain agency employees. The majority opinion relies on a single sentence in *Egan* that mentions "those with the necessary expertise in protecting classified information." *Id.* at 529. But in that sentence, the *Egan* Court was simply contrasting the expertise of agencies with that of outside reviewing bodies, not implying that courts should draw a reviewability line based on which employees of an agency possessed certain amounts of expertise. The full quote from *Egan* makes that clear:

> Predictive judgment of this kind must be made by those with the necessary expertise in protecting classified information. For reasons too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of *the agency* responsible, and this must include broad discretion to determine who may have access to it. Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether *the agency* should have been able to make the necessary affirmative prediction with confidence.

*Id.* (citation, ellipsis, and internal quotation marks omitted) (emphases added).

Nothing in *Egan*'s language suggests that the Supreme Court was only barring review of the security clearance actions of "appropriately trained" employees, as the majority opinion here contends. Maj. Op. at 6 (quoting *Rattigan*, 643 F.3d at 983). Nor have this Court's decisions applying *Egan* drawn the line that the majority opinion creates. Following the Supreme Court's lead, we have referred to the decisionmaking process of the agency as a whole, not to certain parts or employees of an agency, in employment discrimination cases involving security clearance decisions. *See, e.g.*, *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005) ("trier of fact" may not "evaluate the validity of the agency's security determination"); *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999) ("*Egan* applies in a Title VII action to preclude . . . a discrimination claim . . . resulting from an agency security clearance decision"). The separation of powers issue identified by the Supreme Court in *Egan* and reflected in our subsequent decisions stems from the kind of decision being made by the agency official – a predictive judgment about security risks – not from the job title or expertise of the agency official making the decision.

Moreover, the Supreme Court in *Egan* protected the security clearance process as a whole. The Court did not suggest that courts could review distinct parts of that process. The majority opinion here, however, says that only the initiation of security clearance investigations and the grant, denial, or revocation of clearances are within the *Egan* rule. In the majority opinion's view, the reporting of security risks is not within the *Egan* rule. I do not find that distinction in *Egan*. Nor do I think it makes much sense. Investigations and revocations of security clearances will often be prompted by reports of misconduct. Reports of misconduct are an essential part of the overall process of maintaining national

security and preventing those who may be security risks from accessing sensitive government information. *Egan* protects the front end of the security clearance process – including reports of possible security risks – as much as it protects the back end.

One powerful indication that the reporting of security risks is important to national security and falls within the *Egan* rule is that the President himself has required such reporting. In an executive order issued by President Clinton and still in effect, all federal employees with security clearances must make a predictive judgment about what constitutes suspicious behavior and report any such behavior for investigation: "Employees are encouraged and expected to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security." Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. 40,245, 40,253 (Aug. 2, 1995). *Egan* recognized that the "authority to protect such [national security] information falls on the President as head of the Executive Branch and as Commander in Chief." *Egan*, 484 U.S. at 527. The *Egan* rule thus covers reports made under President Clinton's executive order. *See id.* at 527-30. The majority opinion, however, would allow courts to second-guess the decisions of agency employees who report security risks pursuant to President Clinton's executive order. I cannot square that with *Egan*.

I appreciate and share the majority opinion's concern about deterring false reports that in fact stem from a discriminatory motive. But there are a host of sanctions that deter an agency employee from engaging in such behavior. *See, e.g.*, 71 Fed. Reg. 64,562, 64,563 (Nov. 2, 2006) (Department of Justice "retains the right, where appropriate,

to discipline an employee for conduct that is inconsistent with Federal Antidiscrimination and Whistleblower Protection Laws up to and including removal"). And in any event, it is not for us to revise the rule set forth in *Egan*; that's a decision for the Supreme Court or Congress.

* * *

The rule that the Supreme Court announced in *Egan* applies "unless Congress specifically has provided otherwise." 484 U.S. at 530. If Congress wishes to re-strike the balance between personnel and employment discrimination laws on the one hand and national security on the other, it is free to do so – either broadening or narrowing the scope of the protection for agencies' security clearance decisions. Until Congress does so, however, we must apply *Egan* according to its terms. Here, Rattigan claims that FBI officials improperly decided to report him to security clearance investigators. Under *Egan*, we cannot second-guess the FBI's decision. For that reason, Rattigan's suit faces an insurmountable bar, and I would dismiss it.

I respectfully dissent. When we vacated the prior panel decision, we indicated that the parties would have an opportunity to file new petitions for rehearing en banc after our new opinion was issued. If the Government files a petition for rehearing en banc in response to today's revamped but still-flawed majority opinion, I will urge the full Court to grant it.