# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 3, 2015         Decided March 13, 2015

No. 13-5374

WILFRED SAMUEL RATTIGAN,
APPELLANT

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-2009)

———

*Jonathan C. Moore* argued the cause for appellant. With him on the briefs were *Joshua S. Moskovitz* and *James R. Klimaski.*

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Marleigh D. Dover*, Attorney.

Before: GARLAND, *Chief Judge*, KAVANAUGH, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Plaintiff Wilfred Rattigan claims that FBI supervisors whom he had formally accused of discrimination retaliated against him by sending the FBI's Security Division a memo purporting to demonstrate that he posed a security risk. On a previous appeal, we held that Rattigan could prevail only by showing "that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Rattigan v. Holder* ("*Rattigan II*"), 689 F.3d 764, 771 (D.C. Cir. 2012). We remanded to the district court to see whether his evidence could meet that standard.

The central challenge for Rattigan on remand was that the memo had been prepared not by one of the accused supervisors, but by Special Agent Donovan Leighton, who was not charged by Rattigan with discrimination and thus had no apparent reason to retaliate against him. We find that Rattigan is unable to overcome the difficulty and affirm the district court's entry of summary judgment for the FBI.

\* \* \*

Rattigan is a black male of Jamaican descent who worked at the U.S. Embassy in Riyadh, Saudi Arabia as the FBI's primary liaison to the Saudi intelligence service. In October 2001, he accused Cary Gleicher, Michael Pyszczymuka, and Leslie Kaciban, all supervisors in the FBI's Office of International Operations, of discriminating against him on the basis of race and national origin. He later pursued charges with the Equal Employment Opportunity Office.

In November 2001, Gleicher sent Special Agent Leighton on a short assignment to Riyadh, where he evidently grew suspicious about Rattigan. On his return, Leighton brought his concerns first to Gleicher and then to Pyszczymuka, and, on Pyszczymuka's direction, documented them in a memo which Pyszczymuka then referred to the FBI's Security Division. The Security Division conducted an investigation and concluded that the security risks alleged by Leighton were "unfounded." *Rattigan II*, 689 F.3d at 766.

Rattigan filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging, among other things, that the decision to refer Leighton's memo to the Security Division amounted to unlawful retaliation. A jury found for Rattigan, but this court vacated the judgment on the ground that the district court's instructions violated *Department of the Navy v. Egan*, 484 U.S. 518 (1988), by inviting the jury to second guess the Security Division's decision to initiate an investigation. *Rattigan v. Holder* ("*Rattigan I*"), 643 F.3d 975, 986 (D.C. Cir. 2011). We then granted the government's petition for rehearing and narrowed the realm within which Rattigan's claim could survive under *Egan*, imposing the "knowing falsehood" rule quoted above. *Rattigan II*, 689 F.3d at 771. Our remand ended in the district court's grant of summary judgment for the government. See *Rattigan v. Holder*, 982 F. Supp. 2d 69 (D.D.C. 2013).

\* \* \*

Leighton's memo made six claims: (1) that Rattigan occasionally wore Saudi national clothing that he had received as a gift from the Saudi security service, creating the impression he had "gone native"; (2) that Rattigan's Saudi colleagues were attempting to find him a "suitable wife"; (3) that Rattigan hosted wild parties attended by other agents and by female "nurses," a term that might have "be[en] used

by . . . Rattigan as a euphemism for 'prostitutes'"; (4) that Rattigan and his assistant, Gamal Abdel-Hafiz, were inattentive to the FBI's investigation of the September 11 attacks; (5) that Rattigan took an extended absence to make a pilgrimage to Mecca along with Abdel-Hafiz and their Saudi counterparts, during which he could be contacted only through the Saudi security service; and (6) that Rattigan refused to allow temporary duty staff to interact directly with the Saudi security service. *Rattigan I,* 643 F.3d at 978-79.

We have already recognized that Rattigan had conceded the truth of the facts underlying allegations (1), (2), (5), and (6). *Rattigan II*, 689 F.3d at 772. He now complains that Leighton's memo presented these facts in a "misleading" manner. But *Rattigan II* is clear that the "knowingly false" standard cannot be satisfied by assertion of a fact that, though true, is falsely framed so as to suggest a security concern. *Id.* Accordingly, these four allegations are not in dispute.

As to the remaining allegations, Rattigan focuses on demonstrating that Leighton knew these were false. But this is another dead end. Under *Rattigan II* there can be liability for a security investigation referral only where "agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.* at 771. Motive and knowing falsity must unite in the same person. But there is no evidence that Leighton, who was not the object of Rattigan's original discrimination claim, had any unlawful retaliatory motive when he documented his concerns. Rattigan did issue a lengthy email complaint about Leighton, but only after Leighton had already brought his concerns to Pyszczymuka, and on the same day that Leighton had submitted the first draft of his memo. While this email condemned Leighton for statements about the conduct of the FBI mission in Riyadh, it never imputed any discriminatory motivation or behavior to Leighton. Only weeks after he sent

this critique and Leighton submitted the first version of the memo to Pyszczymuka did Rattigan allege discrimination—in the course of an email follow-up to his initial complaint. Leighton did have an opportunity thereafter to revise the memo, but, as discussed below, Rattigan does not allege that he added any falsehoods at this stage. Thus, even if Rattigan could convince a reasonable jury that Leighton knew his allegations were false, his claim would fail.

Rattigan proposes to cobble together his supervisors' alleged retaliatory motive and Leighton's alleged knowing falsehoods. In some circumstances, the law allows a plaintiff to impose liability on a principal by aggregating the unlawfully motivated report of one agent with the act of another. See, e.g., *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191, 1192 (2011); *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1311 (D.C. Cir. 1998). But *Rattigan II*, as we've said, requires joinder in at least one person of the retaliatory purpose with the knowing falsehood. There is no evidence that either Kaciban or Gleicher played any role in the referral. Thus Rattigan can prevail only by showing that Pyszczymuka knew that the facts underlying allegations (3) or (4) were not true.

Rattigan cannot pass this test. He himself testified that Pyszczymuka had "no firsthand knowledge of anything that happened in Riyadh." Deposition of William [sic] S. Rattigan at 195:6-9, *Rattigan v. Ashcroft,* 04-cv-2009 (D.D.C. Dec. 7, 2007). And he offers no evidence that Pyszczymuka encouraged Leighton to include falsehoods in his memo. Rattigan does point to a note by Pyszczymuka's assistant, Walt Smith, to Pyszczymuka, saying that Leighton's first draft "is much too long, and in some cases, inflammatory and unsupported in fact-innuendo, hearsay, etc." But the note also proposed that Leighton should prepare a "redacted/edited" version of the memo for forwarding to the Security Division,

and Pyszczymuka so directed. In a somewhat self-contradictory argument, Rattigan says that "Leighton made the directed changes, but many of the inflammatory allegations and innuendo . . . remained" in the memo. Appellant's Br. 12. Taking the argument at its strongest, and assuming Pyszczymuka to have been fully on notice of Walt Smith's grasp of the facts, this seems to be no more than a claim that Pyszczymuka made inadequate efforts to get the memo *cleansed* of propositions "unsupported in fact." See Oral Argument at 11:30-15:41. But that is a far cry from knowingly reporting false statements.

Rattigan also points to a meeting between Leighton and Pyszczymuka in which Leighton reported his concerns and Pyszczymuka directed him to write them up, but nothing indicates that either man said anything about the inclusion of allegations known to be false. Finally, he claims that he had personally "alerted" Pyszczymuka and the two others whom he had accused (and who therefore may have had a retaliatory motive) to the existence of "false accusations" in the memo. But all this shows is that Pyszczymuka was faced with two competing versions of events—not that Pyszczymuka knew Leighton's account was erroneous. Because Rattigan has not identified a "genuine dispute" as to whether any agency employee "acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false," the FBI is entitled to summary judgment. See *Rattigan II*, 689 F.3d at 771; Fed. R. Civ. P. 56(a).

\*   \*   \*

Rattigan also argues that the district court abused its discretion in denying his requests for additional discovery. In support, he invokes our instruction in *Rattigan II* that the district court should decide the issue of knowing falsehood only "after permitting any necessary discovery," and our

acknowledgment that "[b]ecause we set forth this knowingly false standard for the first time on appeal, Rattigan had little reason to thoroughly develop evidence of knowing falsity in the district court." 689 F.3d at 773.

Rattigan responded by seeking additional discovery that, despite successive rejections by the district court, was well beyond the range opened by *Rattigan II*. He first requested additional discovery on several topics, including "[t]he complete personnel records of Donovan Leighton, Cary Gleicher, Leslie Kaciban, Walt Smith and Michael Pyszczymuka." Joint Status Report 2, *Rattigan v. Holder*, 04-cv-2009 (D.D.C. May 15, 2013), ECF No. 144. At a hearing, the district court rejected this request as insufficiently tailored to the sole issue that our decision had left open. Transcript of Status Conference 2:16-17, *Rattigan v. Holder*, 04-cv-2009 (D.D.C. May 22, 2013).

At the same hearing the court then gave Rattigan's counsel several opportunities to narrow the request, but he failed to do so. For instance, he repeatedly sought discovery on Leighton's credibility to demonstrate that the supervisors "should have known" he was unreliable. *Id.* at 23:15-22, 27:21-28:3, 37:22-23. The district court repeatedly rejected these requests, reminding Rattigan's counsel that his burden was to demonstrate what Pyszczymuka actually knew, not what he should have known. *Id.* at 23:23-24, 28:4-5, 38:5-12.

The district court then gave Rattigan a third opportunity to focus his desired discovery, namely by including a discovery request in his response to the FBI's motion for summary judgment under Rule 56(d). *Id.* at 32:8-9, 33:19-21, 35:14-19, 42:15-16, 47:14-15. The court could hardly have been more clear in its instruction that the request should be specifically framed and narrowly targeted to the issue of knowing falsity on the part of the employees with a motive to

retaliate. See *id.* at 47:1-19 ("You then will give the specifics that you need: I need to depose Leighton about X. I need to depose so-and-so because I'm going to learn Y. So far when you say, I'm going to learn that he's not a credible individual, that will be discovery that is not specific enough."); see also *id.* at 23:25-24:1, 36:10-12, 45:18-20, 46:8-9, 47:7-8.

Rattigan then sought discovery on four topics: (1) Leighton's background and credibility; (2) Leighton's knowledge of the truth or falsity of his allegations; (3) specific incidents not directly related to the case but invoked by the FBI in its motion for summary judgment; and (4) the "process that led to the creation" of the Leighton memo. See Decl. of Jonathan C. Moore in Opp'n to Def.'s Mot. For Summary Judgment ¶¶ 5-10, *Rattigan v. Holder*, 04-cv-2009 (D.D.C. Aug. 9, 2013), ECF No. 150-4.

None of the first three requests bears directly on the key issue of knowing falsehood on the part of the three alleged retaliators, and so the district court was easily within its discretion in denying these requests. While evidence undermining Leighton's credibility might suggest that Pyszczymuka should have known that the information in the memo was unreliable, it would not demonstrate what *Rattigan II* requires—that Pyszczymuka actually knew Leighton was lying. And, as explained above, evidence that Leighton himself knew his memo contained falsehoods would not help Rattigan because Leighton had no retaliatory motive, and his knowledge cannot be automatically attributed to Pyszczymuka.

In contrast, Rattigan's fourth subject does at least encompass the key issue. On that subject, he elaborated only by explaining that he sought information regarding "the interactions that took place between and amongst Michael Pyszczymuka, Walt Smith, Cary Gleicher, Leslie Kaciban and

Donovan Leighton" in order to determine whether any of the supervisors "knew or should have known that the information was knowingly false." See Moore Decl. ¶ 10. But, so formulated, even the fourth subject alone was by no means targeted to features of "the interactions" among the five that were crucial under *Rattigan II*. Rattigan had three chances to frame his discovery request in specific terms. The district court did not abuse its discretion in declining to give him a fourth.

\* \* \*

The order of the district court is

*Affirmed.*