Opinion for the court filed by Circuit Judge WALLACH.
Dissenting opinion filed by Circuit Judge DYK.
WALLACH, Circuit Judge.
The Director of the Office of Personnel Management (“OPM”) seeks review of the decision by the Merit Systems Protection Board (“Board”) holding that the Supreme Court’s decision in Department of the Navy v. Egan, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), limits Board review of an otherwise appealable adverse action only if that action is based upon eligibility for or a denial, revocation, or suspension of access to classified information. Egan, however, prohibits Board review of agency determinations concerning eligibility of an employee to occupy a “sensitive” position, regardless of whether the position requires access to classified information. Accordingly, we REVERSE and REMAND.
I. Background
Rhonda K. Conyers (“Conyers”) and Devon Haughton Northover (“Northover” and collectively, “Respondents”)[1] were indefinitely suspended and demoted, respectively, from their positions with the Department of Defense (“Agency”) after they were found ineligible to occupy “noncritieal sensitive” positions.[2] Ms. Conyers and Mr. Northover independently appealed the Agency’s actions to the Board. In both *1226 appeals, the Agency argued that, because Respondents’ positions were designated “noncritical sensitive,” the Board could not review the merits of the Agency’s determinations under the precedent set forth in Egan.
A The Egan Holding
In Egan, the Supreme Court held that the Board plays a limited role in adverse action cases involving national security concerns. The respondent in Egan lost his laborer’s job at a naval facility when he was denied a required security clearance. 484 U.S. at 520, 108 S.Ct. 818. Reversing our decision in Egan v. Department of the Navy, 802 F.2d 1563 (Fed.Cir.1986), rev’d, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), the Court held that the Board does not have authority to review the substance of the security clearance determination, contrary to what is required generally in other adverse action appeals. 484 U.S. at 530-31, 108 S.Ct. 818. Rather, the Court held that the Board has authority to review only: (1) whether an Executive Branch employer determined the employee’s position required a security clearance; (2) whether the clearance was denied or revoked; (3) whether the employee was provided with the procedural protections specified in 5 U.S.C. § 7513; and (4) whether transfer to a nonsensitive position was feasible. Id. at 530, 108 S.Ct. 818.
B. Ms. Conyers’s Initial Proceedings
Ms. Conyers occupied a competitive service position of GS-525-05 Accounting Technician at the Defense Finance and Accounting Service. Conyers v. Dep’t of Def., 115 M.S.P.R. 572, 574 (2010). Following an investigation, the Agency’s Washington Headquarters Services (“WHS”) Consolidated Adjudications Facility (“CAF”) discovered information about Ms. Conyers that raised security concerns. J.A. 149-52. As a result, effective September 11, 2009, the Agency indefinitely suspended Ms. Conyers from her position because she was denied eligibility to occupy a sensitive position by WHS/ CAF. Conyers, 115 M.S.P.R. at 574. The Agency reasoned that Ms. Conyers’s noncritical sensitive “position required her to have access to sensitive information,” and because WHS/CAF denied her such access, “she did not meet a qualification requirement of her position.”[3] Id. at 574.
Ms. Conyers appealed her indefinite suspension to the Board. Id. In response, the Agency argued that Egan prohibited Board review of the merits of WHS/ CAF’s decision to deny Ms. Conyers eligibility for access “to sensitive or classified information and/or occupancy of a sensitive position.” Id. On February 17, 2010, the administrative judge issued an order certifying the case for an interlocutory appeal and staying all proceedings pending resolution by the full Board. Id. at 575. In her ruling, the administrative judge declined to apply Egan and “informed the parties that [she] would decide the case under the broader standard applied in ... other [5 U.S.C.] Chapter 75 cases which do not involve security clearances.” Id. (brackets in original).
C. Mr. Northover’s Initial Proceedings
Mr. Northover occupied a competitive service position of GS-1144-07 Commissary Management Specialist at the Defense Commissary Agency. Northover v. *1227 Dep’t of Def., 115 M.S.P.R. 451, 452 (2010). Effective December 6, 2009, the Agency reduced Mr. Northover’s grade level to part-time GS-1101-04 Store Associate “due to revocation/denial of his Department of Defense eligibility to occupy a sensitive position.” Id. at 453. In its Notice of Proposed Demotion, the Agency stated that Mr. Northover was in a position that was “designated as a sensitive position” and that WHS/CAF had denied him “eligibility for access to classified information and/or occupancy of a sensitive position.” Id. at 453 (citation omitted).
Mr. Northover subsequently appealed the Agency’s decision to the Board. Id. In response, the Agency argued it had designated the Commissary Management Specialist position a “moderate risk” national security position with a sensitivity level of “noncritieal sensitive,” and under Egan, the Board is barred from reviewing the merits of an agency’s “seeurity-clearance/eligibility determination.” Id.
On April 2, 2010, contrary to the ruling in Conyers, the presiding chief administrative judge ruled that Egan applied and that the merits of the Agency’s determination were unreviewable. Id. The chief administrative judge subsequently certified his ruling to the full Board. Id. All proceedings were stayed pending resolution of the certified issue. Id.
D. The Full Board’s Decision in Conyers and Northover
On December 22, 2010, the full Board affirmed the administrative judge’s decision in Conyers and reversed the chief administrative judge’s decision in North-over, concluding that Egan did not apply in cases where security clearance determinations are not at issue. Conyers, 115 M.S.P.R. at 590; Northover, 115 M.S.P.R. at 468. Specifically, the Board held that Egan limited the Board’s review of an otherwise appealable adverse action only if that action is based upon eligibility for or a denial, revocation, or suspension of access to classified information.[4] Conyers, 115 M.S.P.R. at 590; Northover, 115 M.S.P.R. at 467-68. Because Ms. Conyers and Mr. Northover did not occupy positions that required access to classified information, the Board concluded that Egan did not preclude Board review of the underlying Agency determinations. Conyers, 115 M.S.P.R. at 585; Northover, 115 M.S.P.R. at 464.
OPM moved for reconsideration of the Board’s decisions, which the Board denied. Berry v. Conyers, et al., 435 Fed.Appx. 943, 944 (Fed.Cir.2011) (order granting OPM’s petition for review). OPM petitioned for review to this court, and the petition was granted on August 17, 2011. Id. We have jurisdiction to review the Board’s final decision under 5 U.S.C. § 7703(d) and 28 U.S.C. § 1295(a)(9).[5]
*1228 II. Statutory grounds for national SECURITY BASED REMOVAL OF GOVERNMENT EMPLOYEES
The statutes provide a two-track system for removal of employees based on national security concerns. Egan, 484 U.S. at 526, 108 S.Ct. 818. In particular, relevant provisions of the Civil Service Reform Act of 1978 (“CSRA” or the “Act”), Chapter 75 of Title 5 of the United States Code entitled, “Adverse Actions,” provides two sub-chapters related to removals. The first, subchapter II (§§ 7511-7514), relates to removals for “cause.” Under § 7512, an agency’s indefinite suspension and a reduction in grade of an employee, as here, may qualify as “adverse actions.” 5 U.S.C. § 7512(2)-(3). An employee subject to an adverse action is entitled to the protections of § 7513, which include written notice of the specific reasons for the proposed action, an opportunity to respond to the charges, the requirement that the agency’s action is taken to promote the efficiency of the service, and the right to review by the Board of the action. An employee removed for “cause” has the right, under § 7513(d), to appeal to the Board. On review of the action by the Board under § 7701,[6] the Board may sustain the agency’s action only if the agency can show that its decision is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B).[7]
The second, subchapter IV (§§ 7531-7533), relates to removals based upon national security concerns. An employee suspended under § 7532(a) is not entitled to appeal to the Board. Nonetheless, the statute provides for a summary removal process that entitles the employee to specified pre-removal procedural rights, including a hearing by an agency authority. 5 U.S.C. § 7532(c).
III. Egan’s application to conyers AND NORTHOVER
The Board and Respondents urge this court to limit Egan’s application to security clearance determinations, reasoning that national security concerns articulated in that case pertain to access to classified information only. Egan cannot be so confined. Its principles instead require that courts refrain from second-guessing Executive Branch agencies’ national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information. For the following reasons, Egan must appfy-
A. Egan Addressed Broad National Security Concerns That Are Traditionally the Responsibility of the Executive Branch
Egan, at its core, explained that it is essential for the Executive Branch and its agencies to have broad discretion in making determinations concerning national security. Affording such discretion to agencies, according to Egan, is based on the President’s “authority to classify and con *1229 trol access to information bearing on national security and to determine” who gets access, which “flows primarily from [the Commander in Chief Clause] and exists quite apart from any explicit congressional grant.” 484 U.S. at 527, 108 S.Ct. 818. Egan also recognized the general principle that foreign policy is the “province and responsibility of the Executive.” Id. at 529, 108 S.Ct. 818 (citation omitted). Accordingly, the Court reasoned:
[ I]t is not reasonably possible for an outside nonexpert body to review the substance of such a[n agency determination concerning national security] and to decide whether the agency should have been able to make the necessary affirmative prediction [that a particular individual might compromise sensitive information] with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.
Id. Hence, unless Congress specifically has provided otherwise, courts traditionally have shown “great deference” to what “the President — the Commander in Chief — has determined ... is essential to national security.” Winter v. Natural Res. Def. Council, 555 U.S. 7, 24, 26, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (citation omitted).
Despite the undisputed role of the Executive within this realm, Respondents argue applying Egan to these cases “may deprive either the Congress or the Judiciary of all freedom of action merely by invoking national security.” Resp’ts’ Br. 23. Certainly, under the Constitution, Congress has a substantial role in both foreign affairs and national security. Congress, therefore, has the power to guide and limit the Executive’s application of its powers. Nevertheless, no controlling congressional act is present here.
As Egan recognized, the CSRA did not confer broad authority to the Board in the national security context.[8] 484 U.S. at *1230 530-31, 108 S.Ct. 818 (“An employee who is removed for ‘cause’ under § 7513, when his required clearance is denied, is entitled to the several procedural protections specified in that statute. The Board then may determine whether such cause existed, whether in fact clearance was denied, and whether transfer to a nonsensitive position was feasible. Nothing in the Act, however, directs or empowers the Board to go further.”) (emphasis added). As a result, Congress presumably has left the President and Executive Branch agencies broad discretion to exercise their powers in this area. See Dames & Moore v. Regan, 453 U.S. 654, 678, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (“Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act,” and “[s]uch failure of Congress ... does not, ‘especially ... in the areas of foreign policy and national security,’ imply ‘congressional disapproval’ of action taken by the Executive.”) (quoting Haig v. Agee, 453 U.S. 280, 291, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)). Accordingly, when “the President acts pursuant to an express or implied authorization from Congress,” his actions should be “supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion ... rest[s] heavily upon any who might attack it.” Id. at 668, 101 S.Ct. 2972 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)). Courts thus must tread lightly when faced with the potential of second-guessing discretionary agency determinations concerning national security.
The existence of § 7532 does not alter the agencies’ broad discretion to exercise their powers in the national security context. The Board and Respondents argue that Congress has spoken directly on the issue of removal for national security concerns by enacting § 7532, and that applying Egan in this instance “would in essence allow the Executive to replace § 7532 with § 7513 ... rendering § 7532 a nullity.” Resp’ts’ Br. 24-25; see Board’s Br. 42-43. This argument is similar, if not identical, to those rejected by the Egan Court. 484 U.S. at 533, 108 S.Ct. 818 (“The argument is that the availability of the § 7532 procedure is a ‘compelling’ factor in favor of Board review of a security-clearance denial in a case under § 7513.”).
In Egan, the Court observed the alternative availability of § 7513 and § 7532. Id. at 532, 108 S.Ct. 818. Specifically, the Court acknowledged that § 7532 does not preempt § 7513 and that the two statutes stand separately and provide alternative routes for administrative action. Id. In addition, the Court found that the two sections were not anomalous, but merely different. Id. at 533, 108 S.Ct. 818. The Court also found that one section did not necessarily provide greater procedural protections than the other. Id. at 533-34, 108 S.Ct. 818.
*1231 The Court in Carlucci v. Doe, 488 U.S. 93, 109 S.Ct. 407, 102 L.Ed.2d 395 (1988), further articulated and clarified § 7532’s applicability. In that case, the Court determined that the summary removal mechanism set out in § 7532, as well as 50 U.S.C. § 833,[9] were discretionary mechanisms in cases involving dismissals for national security reasons. Id. at 100, 109 S.Ct. 407. The Court found that § 7532 was not mandatory, but rather permissive: “ ‘Notwithstanding other statutes,’ the head of an agency ‘may’ suspend and remove employees ‘in the interests of national security.’ ” Id. (quoting § 7532) (finding nothing in the legislative history of § 7532 indicating that the statute’s procedures are the exclusive means for removals on national security grounds or that § 7532 displaces the otherwise applicable removal provisions of the agencies covered by the section). Therefore, it was held that the National Security Agency was not required to apply either § 7532 or § 833 and could have acted under its ordinary dismissal procedure if it so wished.[10] Id. at 99-100, 109 S.Ct. 407.
Moreover, Carlucci held that Congress enacted § 7532 to “supplement, not narrow, ordinary agency removal procedures.” Id. at 102, 109 S.Ct. 407. The Court reasoned that because of its summary nature, “Congress intended § 7532 to be invoked only where there is ‘an immediate threat of harm to the national security’ in the sense that the delay from invoking ‘normal dismissal procedures’ could ‘cause serious damage to the national security.’ ” Id. (quoting Cole v. Young, 351 U.S. 536, 546, 76 S.Ct. 861, 100 L.Ed. 1396 (1956)). Consequently, should § 7532 be mandatory as the Board and Respondents effectively argue, it would become the exclusive procedure in this case and similar cases, and “no national security termination would be permissible without an initial suspension and adherence to the Cole v. Young standard.” Id. Given Carlucci’s teaching, we are unconvinced that Congress intended any such result when it enacted § 7532. Id. Accordingly, eligibility to occupy a sensitive position is a discretionary agency determination, principally within the purview of the Executive Branch, the merits of which are unreviewable by the Board.
B. Egan’s Analysis Is Predicated On “National Security Information”
The Board and Respondents conflate “classified information” with “national security information,” but Egan does not imply those terms have the same meaning.[11] In fact, Egan’s core focus is on “national security information,” not just “classified information.” 484 U.S. at 527, *1232 108 S.Ct. 818 (recognizing the government’s “compelling interest in withholding national security information ”) (emphasis added). As Egan noted, the absence of a statutory provision in § 7512 precluding appellate review of determinations concerning national security creates a presumption in favor of review. Id. The Court, nevertheless, held that this “proposition is not without limit, and it runs aground when it encounters concerns of national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch.” Id. (emphasis added).[12] Egan therefore is predicated on broad national security concerns, which may or may not include issues of access to classified information. Thus, Egan is not limited to adverse actions based upon eligibility for or access to classified information.
In addition, sensitive positions concerning national security do not necessarily entail access to “classified information” as the Board and Respondents contend. The Board cites Cole v. Young and references the Court’s discussion of the legislative history of the Act of August 26, 1950[13] in support of its proposition that national security concerns relate strictly to access to classified information. However, the Board’s analysis is flawed.
Cole held that a sensitive position is one that implicates national security, and in defining “national security” as used in the Act of August 26, 1950, the Court concluded that the term “was intended to comprehend only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact' on the general welfare.” 351 U.S. at 544, 76 S.Ct. 861 (emphasis added).[14] Thus, even in Cole, sensitive positions were defined as those that involve national security information and not necessarily those that involve classified information.
Indeed, “sensitive positions” that can affect national security and “access to classified information” are parallel concepts that are not necessarily the same. As the Court reasoned:
Where applicable, the Act authorizes the agency head summarily to suspend an employee pending investigation and, after charges and a hearing, finally to terminate his employment, such termination not being subject to appeal. There is an obvious justification for the summary suspension power where the *1233 employee occupies a “sensitive” position in which he could cause serious damage to the national security during the delay incident to an investigation and the preparation of charges. Likewise, there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information.
Cole, 351 U.S. at 546, 76 S.Ct. 861 (emphasis added).[15] Hence, contrary to the Board and Respondents’ contentions, “classified information” is not necessarily “national security information” available to an employee in a sensitive position.
The Board and Respondents’ focus on one factor, eligibility of access to classified information, is misplaced.[16] Government positions may require different types and levels of clearance, depending upon the sensitivity of the position sought. Egan, 484 U.S. at 528, 108 S.Ct. 818. A government appointment is expressly made subject to a background investigation that varies in scope according to the degree of adverse effect the applicant could have on national security. Id. (citing Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949-1953 Comp.)). As OPM states: “An agency’s national security calculus will vary widely depending upon, inter alia, the agency’s mission, the particular project in question, and the degree of harm that would be caused if the project is compromised.” OPM’s Br. 33. As a result, an agency’s determination in controlling access to national security information entails consideration of multiple factors.
For example, categorizing a sensitive position is undertaken without regard to access to classified information, but rather with regard to the effect the position may have on national security. See Exec Order No. 10,450 § 3. Similarly, predictive judgments [17] are predicated on an individual’s potential to compromise information, which might be unclassified. Consequently, the inquiry in these agency determinations concerning national security is not contingent upon access to classified information.
*1234 Finally, Egan’s concerns regarding the agencies’ “clearly consistent with the interests of national security” standard conflicting with the Board’s preponderance of the evidence standard apply equally here. Egan held that:
As noted above, security clearance normally will be granted only if it is “clearly consistent with the interests of the national security.” The Board, however, reviews adverse actions under a preponderance of the evidence standard. § 7701(c)(1)(B). These two standards seem inconsistent. It is difficult to see how the Board would be able to review security-clearance determinations under a preponderance of the evidence standard without departing from the “clearly consistent with the interests of the national security” test. The clearly consistent standard indicates that security-clearance determinations should err, if they must, on the side of denials. Placing the burden on the Government to support the denial by a preponderance of the evidence would inevitably shift this emphasis and involve the Board in second-guessing the agency’s national security determinations.
484 U.S. at 531, 108 S.Ct. 818. An agency’s determination of an employee’s ineligibility to hold a sensitive position must be “consistent with the interests of national security.” See Exec. Order No. 10,-450, § 3. Thus, such agency determinations cannot be reviewable by the Board because this would improperly place an inconsistent burden of proof upon the government. Accordingly, Egan prohibits review of Executive Branch agencies’ national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information.
IV. Unclassified information can have A MATERIAL ADVERSE EFFECT ON NATIONAL SECURITY
National security concerns render the Board and Respondents’ positions untenable. It is naive to suppose that employees without direct access to already classified information cannot affect national security. The Board and Respondents’ narrow focus on access to classified information ignores the impact employees without security clearances, but in sensitive positions, can have.[18]
*1235 Defining the impact an individual may have on national security is the type of predictive judgment that must be made by those with necessary expertise. See Egan, 484 U.S. at 529, 108 S.Ct. 818 (“The attempt to define not only the individual’s future actions, but those of outside and unknown influences renders the ‘grant or denial of security clearances ... an inexact science at best.’”) (quoting Adams v. Laird, 420 F.2d 230, 239 (D.C.Cir.1969)). The sources upon which intelligence is based are often open and publically available. Occasionally, intelligence is obtained from sources in a fashion the source’s government would find improper. Occasionally, those means of obtention are coercive and/or subversive.[19]
This area of National Security Law is largely about preventing human source intelligence gathering in a manner which does not, in an open society, unnecessarily limit the public’s right to access information about its government’s activities. Still, there clearly is a need for such prevention. Within the sphere of national security limitations on government employment, our society has determined that courts should tolerate and defer to the agencies’ threat limiting expertise. See id.
While threats may change with time, Egan’s analysis remains valid. The advent of electronic records management, computer analysis, and cyber-warfare have made potential espionage targets containing means to access national security information vastly more susceptible to harm by people without security clearances. The mechanics of planting within a computer system a means of intelligence gathering are beyond the ken of the judiciary; what matters is that there are today more sensitive areas of access than there were when Egan was authored. Its underlying analysis, nevertheless, is completely applicable — the President, as Commander-in-Chief, has the right and the obligation, within the law, to protect the government against potential threats. Egan, 484 U.S. at 527, 108 S.Ct. 818.
Some rights of government employees are certainly abrogated in national security cases. The Board and Respondents must recognize that those instances are the result of balancing competing in *1236 terests as was the case in Egan and as is the case here. See Hamdi v. Rumsfeld, 542 U.S. 507, 529, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (“[T]he process due in any given instance is determined by weighing the ‘private interest that will be affected by the official action’ against the Government’s asserted interest, ‘including the function involved’ and the burdens the Government would face in providing greater process.”) (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).[20] Hence, as Lord Cyril Radcliffe noted, security must be weighed against other important questions “in that free dialogue between government ... and people” out of which public life is built.[21]
In our society, it has been accepted that genuine and legitimate doubt is to be resolved in favor of national security.[22] See Egan, 484 U.S. at 527, 108 S.Ct. 818; see also United States v. Robel, 389 U.S. 258, 267, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (“[W]hile the Constitution protects against invasions of individual rights, it does not withdraw from the Government the power to safeguard its vital interests .... The Government can deny access to its secrets to those who would use such information to harm the Nation.”) (citation omitted). That was the philosophical underpinning of Egan and it is the holding of this court today. Accordingly, the merits of these agency determinations before us are not reviewable by the Board.
*1237 V. Conclusion
For the foregoing reasons, the Board cannot review the merits of Executive Branch agencies’ national security determinations concerning eligibility of an employee to occupy a sensitive position that implicates national security. As OPM notes, “there is nothing talismanic about eligibility for access to classified information.” OPM’s Br. 27. The core question is whether an agency determination concerns eligibility of an employee to occupy a sensitive position that implicates national security. When the answer to that question is in the affirmative, Egan applies and the Board plays a limited role in its review of the determination. We REVERSE and REMAND for further proceedings consistent with this decision.
REVERSED AND REMANDED

. Although the Board, Ms. Conyers, and Mr. Northover are all Respondents, we refer to the Board as the "Board" and "Respondents” will refer to Ms. Conyers and Mr. Northover.

. Departments and agencies of the Government classify jobs in three categories: "critical sensitive,” "non-critical sensitive,” and "nonsensitive.” Egan, 484 U.S. at 528, 108 S.Ct. 818. The underlying cases involve "noncritieal sensitive” positions, which are defined as: “Positions with potential to cause damage to ... national security, up to and including damage at the significant or serious level. These positions include: (1) Access to Secret, ”L,” Confidential classified information!;] (2) Any other positions with potential to cause harm to national security to a moderate degree....” J.A. 326 (emphasis added).

. The record indicates that Ms. Conyers requested an appearance before an administrative judge with the Defense Office of Hearings and Appeals ("DOHA”) regarding her denial of eligibility to occupy a sensitive position. Conyers, 115 M.S.P.R. at 574; J.A. 123. DOHA ultimately denied relief. Conyers, 115 M.S.P.R. at 574. The Agency subsequently removed Ms. Conyers effective February 19, 2010. Id.

. The Board considered "security clearance” to be synonymous to "access to classified information.” Conyers, 115 M.S.P.R. at 580.

. On remand, Conyers was dismissed as moot, and Northover was dismissed without prejudice to file again pending the resolution of this petition. J.A. 900-05; 1821. To the extent there are any Article III case or controversy concerns as a result of these dismissals, we find that OPM, at the least, maintains sufficient interests in this petition to satisfy any Article III case or controversy requirement. See Horner v. Merit Sys. Protection Bd., 815 F.2d 668, 671 (Fed.Cir.1987) ("We have no question that the issue of the [Office of Special Counselj’s authority to bring a general disciplinary action against an employee, and in turn the issue of the board's jurisdiction to hear such a case, the latter being dependent on the former, is of vital interest to OPM, which has administrative responsibility for personnel practices and policies throughout most parts of government. These interests are more than sufficient to satisfy the section 7703(d) requirements and any Article III case or controversy requirement.”); see also Berry, 435 Fed.Appx. at 945 (granting petition for review because "[w]e agree that the issues in the Board’s orders raise an issue *1228 of such interest, i.e., whether the agency must disclose its determinations regarding what it classifies as issues of national security and must litigate the merits of such a determination, and thus are subject to immediate review.'').

. 5 U.S.C. § 7701 provides, in relevant part: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation.” 5 U.S.C. § 7701(a). It is undisputed that Respondents are "employees” as defined in the applicable statutes in this case. See 5 U.S.C. § 7511(a)(1)(A) ("[E]mployee means ... an individual in the competitive service....").

. The two cases on appeal here proceeded pursuant to 5 U.S.C. § 7513(d).

. The dissent states the majority has "completely fail[ed] to come to grips with the [CSRA].” Dissent Op. at 1239. In 1990, the CSRA was amended after the Court's decision in U.S. v. Fausto, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). There, the Court decided that the CSRA's silence regarding appeal rights for non-preference eligible members of the excepted service reflected congressional intent to preclude any review under chapter 75 for such employees. Id. at 448, 108 S.Ct. 668. In response, Congress passed the Civil Service Due Process Amendments ("1990 Amendments”) expanding the Board’s jurisdiction to some, but not all, non-preference eligible excepted service employees. Pub. L. No. 101-376, 104 Stat. 461 (1990).
The dissent construes the 1990 Amendments as extending by implication Board review of agency determinations concerning sensitive positions. Dissent Op. at 1241. Because certain agencies, such as the Federal Bureau of Investigation, Central Intelligence Agency, and National Security Agency were expressly exempted, the dissent posits that Board review must extend to all other positions that were not excluded. Id. at 1241-42. Certain employees of the General Accounting Office, the Veterans Health Sciences and Research Administration, the Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority, however, were also excluded, because separate statutes excluded the employees of these agencies from the normal appeals process. H.R.Rep. No. 101-328 at 5 (1989), reprinted in 1990 U.S.C.C.A.N. 695. Thus, the dissent’s view that Congress "crafted some exceptions for national security and not others” is speculative because “national security” was not a factor providing for these exclusions.
Similarly, the dissent refers to the Department of Defense’s (“DOD”) creation of the National Security Personnel System ("NSPS”) in 2003 to further support the notion that Congress spoke on the issue before this court. Dissent Op. at 1239-40. The dissent’s position is neither supported by statutory language nor legislative history. The statute creating the NSPS, the subsequent repeal of certain regulations concerning the DOD’s appeals process, and the ultimate repeal of the statute creating the NSPS itself in 2009, do not show that Congress intended to preclude the DOD from insulating employment *1230 decisions concerning national security from Board review. NSPS was established to overhaul the then-existing personnel management system and polices of the DOD. See National Defense Authorization Act, Pub. L. 108-136, 117 Stat. 1392 (2003). In 2009, NSPS was repealed largely due in part to strong opposition from labor organizations regarding issues of collective bargaining. See Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed. Reg. 66,123; see also S.Rep. No. 111-35 at 185 (2009) ("[T]he committee has received many complaints from DOD employees during the 5 years during which the [DOD] has sought to implement NSPS, to the detriment of needed human capital planning and workforce management initiatives.”). There is nothing in these statutes that shows Congress intended Board review of agency determinations pertaining to employees in sensitive positions.

. 50 U.S.C. § 833 was a summary removal provision in the 1964 National Security Agency Personnel Security Procedures Act, 50 U.S.C. §§ 831-35 (repealed October 1, 1996).

. The Carlucci Court also affirmed Egan’s conclusion regarding §§ 7513 and 7532:
We thus agree with the conclusion of the Merit Systems Protection Board in a similar case that "section 7532 is not the exclusive basis for removals based upon security clearance revocations,” Egan v. Department of the Navy, 28 M.S.P.R. 509, 521 (1985), and with the Court of Appeals for the Federal Circuit that "[t]here is nothing in the
text of section 7532 or in its legislative history to suggest that its procedures were intended to preempt section 7513 procedures whenever the removal could be taken under section 7532. The language of section 7532 is permissive.” Egan v. Department of the Navy, 802 F.2d 1563, 1568 (Fed.Cir.1986), rev’d, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988).
Carlucci, 488 U.S. at 104, 109 S.Ct. 407.

.Likewise, the dissent’s key error is that it conflates "authority to classify and control access to information bearing on national security” with "the authority to protect classified information.” Dissent Op. at 1248-49.

. It is clear from the use of the clause "as in this case” following the "runs aground” clause that national security concerns are the Supreme Court's general proposition, and security clearances simply exemplify the types of concerns falling within this broad category.

. The Act of August 26, 1950, Pub. L. No. 81-733, ch. 803, 64 Stat. 476 (1950), gave heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary in the interest of the national security of the United States. Conyers, 115 M.S.P.R. at 580 n. 17. The Act was the precursor to 5 U.S.C. § 7532. Id.

.It follows that an employee can be dismissed 'in the interest of the national security’ under the Act only if he occupies a ‘sensitive’ position, and thus that a condition precedent to the exercise of the dismissal authority is a determination by the agency head that the position occupied is one affected with the 'national security.’ Cole, 351 U.S. at 551, 76 S.Ct. 861 (emphasis added). Accordingly, the Court in Cole remanded the case to determine whether the petitioner’s position was one in which he could adversely affect national security. Id. at 557, 76 S.Ct. 861.

. By using the word, "likewise,” the Court compares the two concepts, "sensitive positions” and "access to classified information.” In doing so, it makes clear that they are parallel concepts that are not the same.

. The centerpiece of the Egan analysis, Executive Order No. 10,450, makes no mention of "classified information.” Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949-1953) ("The head of any department or agency shall designate, or cause to be designated, any position within his department or agency the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security as a sensitive position.”) (emphasis added). In addition, other relevant statutes and regulations define “sensitive” position in the broadest sense by referring to "national security” generally. See 10 U.S.C. § 1564 ("Security clearance investigations ... (e) Sensitive duties. — For the purposes of this section, it is not necessary for the performance of duties to involve classified activities or classified matters in order for the duties to be considered sensitive and critical to the national security.”) (emphasis added); see also 5 C.F.R. § 732.102 ("(a) For purposes of this part, the term national security position includes: (1) Those positions that involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage....”) (emphasis added).

.A predictive judgment of an individual is "an attempt to predict his [or her] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he [or she] might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct such as having close relatives residing in a country hostile to the United States.” Egan, 484 U.S. at 528-29, 108 S.Ct. 818.

. There are certainly numerous government positions with potential to adversely affect national security. The Board goes too far by comparing a government position at a military base commissary to one in a "Seven Eleven across the street.” Oral Argument at 28:10-15, Berry v. Conyers, et al., 2011-3207, available at http://www.cafc.uscourts.gov/oralargument-recordings/search/audio.html. Commissary employees do not merely observe "[glrocery store stock levels” or otherwise publicly observable information. Resp’ts’ Br. 20. In fact, commissary stock levels of a particular unclassified item — sunglasses, for example, with shatterproof lenses, or rehydration products — might well hint at deployment orders to a particular region for an identifiable unit. Such troop movements are inherently secret. Cf. Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) ("When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right.... No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.’’) (citing Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)) (emphasis added). This is not mere speculation, because, as OPM contends, numbers and locations could very well be derived by a skilled intelligence analyst from military commissary stock levels. See Oral Argument at 13:19-14:03, Berry v. Conyers, et al., 2011-3207, available at http:// www.cafc.uscourts.gov/oral-argumentrecordings/search/audio.html (Q: "Can a position be sensitive simply because it provides observability? That is, one of these examples that was given was someone working at a *1235 commissary; it seems to me that someone working at a commissary has an opportunity without access to classified information to observe troop levels, potential for where someone is going, from what they are buying, that sort of thing.” A: "I think that is right your honor. We agree with that, and I think in Egan, he, Mr. Egan worked on a nuclear submarine. And so, part of it was simply from what he was observing by coming and going of a nuclear submarine. And so, sensitivity can be the place where the employee works, what are they able to observe, what could they infer from, what you say, from the purchases and shipments....”).

. For example, the intelligence community may view certain disparaging information concerning an employee as a vulnerability which can be used to blackmail or coerce information out of the individual. See Egan, 484 U.S. at 528, 108 S.Ct. 818 (recognizing that the government has a compelling interest in protecting truly sensitive information from those who, “under compulsion of circumstances or for other reasons ... might compromise sensitive information.”); see also Exec. Order 10,450, § 8 (“[IJnvestigations conducted ... shall be designed to develop information as to whether the employment or retention in employment ... is clearly consistent with ... national security.... Such information [relating, but not limited to] ... (ii) Any deliberate misrepresentations, falsifications, or omissions of material facts ... (iii) Any criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, habitual use of intoxicants to excess, drug addiction, sexual perversion, or financial irresponsibility.") (emphasis added). Hence, as the Agency found, information regarding Ms. Conyers’s debt is a reasonable concern. See J.A. 149-52.

. Working for the government is not only an example of civic duty but also an honorable and privileged undertaking that citizens cannot take lightly. This is especially true when the government position implicates national security. In other words, being employed by a government agency that deals in matters of national security is not a fundamental right. Accordingly, the competing interests in this case undoubtedly weigh on the side of national security.

. 218 Pari. Deb., H.L. (5th ser.) (1967) 781-83, available at http://hansard.millbank systems.com/lords/1967/jul/06/thed-noticesystemradcliffe-committees (discussing the publication of a story concerning national security).

. Although adverse actions of this type are largely unreviewable, courts may examine allegations of constitutional violations or allegations that an agency violated its own procedural regulations. See, e.g., Egan, 484 U.S. at 530, 108 S.Ct. 818. For example, the government’s invocation of national security authority does not preclude judicial review in instances involving fundamental rights. See Hamdi, 542 U.S. at 529-30, 124 S.Ct. 2633 (finding due process violation of those classified as "enemy combatants” and affording great weight to physical liberty as a fundamental right). On the other hand, courts generally do not accord similar weight to an individual in cases concerning national security where no such fundamental right is implicated. See, e.g., Bennett v. Chertoff, 425 F.3d 999, 1004 (D.C.Cir.2005) (holding that substantial evidence of national security concerns as a contemporaneous reason for the agency’s action in a Title VII case was enough for resolution in favor of executive discretion). In other very limited circumstances, Title VII claims raised in the context of a security clearance investigation may be justiciable. In Rattigan v. Holder, 689 F.3d 764 (D.C.Cir.2012), the court held that: (1) "Egan's absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns,” id. at 768; and (2) "Title VII claim[s] may proceed only if ... [it can be shown] that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false,” id. at 771. Although distinguishable from this case because Rattigan is specific only to security clearances, Rattigan does emphasize the importance of predictive judgments and the deference that courts must afford Executive Branch agencies in matters concerning national security. Id. at 765-70.